**AMERICAN JEWISH CONGRESS et al., Appellants,**

v.

**Cyrus R. VANCE et al.**

**No. 76–1983.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1977.

Decided April 21, 1978.

Joel H. Levy, Washington, D. C., with whom Dorothy Sellers, Washington, D. C., was on the brief, for appellants.

Catherine A. Ribnick, Atty., Dept. of Justice, of the bar of District of Columbia Court of Appeals, Washington, D. C., pro hac vice, by special leave of court for appellee. Irving Jaffe, Acting Asst. Atty. Gen., Leonard Schaitman, David J. Anderson, John T. Boese, Attys., Dept. of Justice, and Earl J. Silbert, U. S. Atty., Washington, D. C., were on the brief, for appellees.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

Opinion filed by TAMM, Circuit Judge.

Opinion filed by McGOWAN, Circuit Judge, concurring separately.

Opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting in part.

TAMM, Circuit Judge:

Appellants, the American Jewish Congress and certain individual officials and members thereof, brought suit in the United States District Court for the District of Columbia on their own behalf and as representatives of all other American citizens of the Jewish religion, ancestry, and identity, seeking declaratory, injunctive, and mandamus relief against appellees, certain cabinet officers and subordinate officials of the United States government. The complaint alleges that appellees' cooperation in programs with the government of Saudi Arabia that directly or indirectly discriminate against American Jews violates the first and fifth amendments and article VI of the Constitution.[1] The district court granted appellees' motion to dismiss, finding that the case presented a non-justiciable political question,[2] and thereafter denied appellants' motion to vacate the order.[3] For the reasons stated below, which differ from those of the district court, we affirm the dismissal of the complaint.

I

In early June of 1974, Prince Fahd bin Abd al Aziz, then Second Deputy Prime Minister and Minister of Interior of Saudi Arabia, visited the United States for discussions with President Nixon and Secretary of State Kissinger. On June 8, Prince Fahd and Secretary Kissinger issued a Joint Statement on Saudi Arabian-United States Cooperation (Joint Statement),[4] which provides in part, for the establishment of a Joint Commission on Economic Cooperation, headed by United States and Saudi Arabian government officials, "to promote programs of industrialization, trade, manpower training, agriculture, and science and technology" in Saudi Arabia.[5] In pursuance of the Joint Statement, further agreements have

---

1. Record Entry (R.E.) 1 at 9; Appendix (App.) at 11.

2. R.E. 6; App. at 21–23.

3. R.E. 12; App. at 29.

4. R.E. 1, Exhibit B; App. at 15–18.

5. *Id.,* Exhibit B at 2; App. at 16. The Joint Commission is to review the plans and recommendations of specialized Joint Working Groups and is to "encourage and facilitate peri-

been reached and programs undertaken which specifically provide for advisors, technicians, and scientists from both the private and the public sectors of the United States to be sent to Saudi Arabia to implement various cooperative projects.[6]

Although the Saudi government has stated that its boycott of Israel is not based on racial or religious discrimination or discrimination based on national origin and is not intended against the United States,[7] it is nevertheless the established policy of Saudi Arabia to exclude those of Jewish religion, ancestry, or identity from its boundaries by denominating them "undesirable persons" and denying them visas.[8] Recognizing this practice and similar practices in other nations, President Ford issued a directive in 1975, prohibiting all federal agencies and departments and all federal contractors and subcontractors from cooperating or acquiescing in visa or admission discrimination by any nation when selecting or hiring persons for foreign assignments or contracts. Furthermore, in the event of visa rejection, the State Department is to attempt to gain entry for any individual subjected to such exclusionary policies.[9] Regardless of this executive action and Saudi Arabia's statements of lack of discrimination, appellants have alleged that appellees' implementation of the Joint Statement so involves them in Saudi Arabia's exclusionary policies as to constitute illegal conduct in violation of the first and fifth amendments and article VI of the Constitution.[10]

As stated earlier, appellants (hereinafter referred to as plaintiffs) are the American Jewish Congress, a not-for-profit membership corporation of American Jews, and six of its officials and members, each individual plaintiff also being a United States citizen and taxpayer. They allege generally that the promotion of the Joint Statement by appellees (hereinafter referred to as defendants), with full awareness of Saudi Arabian discriminatory practices, has the purpose and effect of discouraging American Jews from participating in the economic opportunities arising therefrom.[11] Specifically, plaintiff Louis Kaplan alleges that the applied to the Midwest Universities Consortium for International Activities for a position as an advisor to a university in Saudi Arabia and that he believes his rejection was based solely on his Jewish religion, ancestry, and identity.[12] Plaintiff Martin Watkins alleges that he was deterred from applying for a job in Saudi Arabia, advertised by a Maryland corporation, because the completed application would have revealed that he was Jewish and therefore subject to Saudi Arabian exclusionary policies.[13]

The remedy sought by plaintiffs from the district court includes a declaration that defendants' effectuation of the Joint Statement is unconstitutional and equitable relief against defendants' further implementation of that Statement or "any program or activity involving the Government of

odic visits to Saudi Arabia by scientists, engineers and research specialists drawn from the United States Government, universities, and private business in order to supplement the operations of the Working Groups and to examine specific proposals for cooperation. *Id.,* Exhibit B at 3; App. at 17.

6. *See, e. g.,* R.E. 5, Exhibit A at 2 (Technical Cooperation Agreement); *id.,* Exhibit E (Fact Sheet, U.S./Saudi Arabian Joint Commission on Economic Cooperation); *id.,* Exhibit B at 2, 5–8 (Joint Communique On the First Session of the Joint Commission); *id.,* Exhibit C at 5–7 (Joint Communique On the Second Session of the Joint Commission). *See generally id.,* Exhibit D (Project Agreements).

7. *See id.,* Exhibit C at 2.

8. R.E. 1, Exhibit A; App. at 13–14.

9. 11 Weekly Comp. of Pres. Doc. 1305–07 (Nov. 24, 1975); R.E. 5, Exhibit F.

10. R.E. 1 at 7–9; App. at 9–11.

11. *Id.* at 8; App. at 10.

12. *Id.* at 7; App. at 9.

13. *Id.* at 8; App. at 10. Both the consortium and the corporation sponsoring the positions in Saudi Arabia are alleged to be "instruments towards implementing the Agreement and otherwise participating in and promoting trade and commercial relations between the United States and Saudi Arabia." *Id.* at 7; App. at 9. *See id.* at 8; App. at 10.

Saudi Arabia which directly or indirectly discriminates against American citizens by reason of their Jewish religion, ancestry or identity." [14] The district court did not reach the merits of the case or the scope of the relief requested. Finding that international agreements such as the Joint Statement are wholly entrusted to the legislative and executive branches of government, it dismissed the complaint on the basis of the non-justiciability of the political question it presented. [15]

The concepts of standing and political question are separate aspects of justiciability, and either the absence of standing or the presence of a political question precludes a federal court, under article III of the Constitution, from hearing or deciding the case presented. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *accord, Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). There is at present no fixed rule as to the order of analysis of these elements of justiciability. *Id.* at 215 n.5, 94 S.Ct. 2925. [16] However, we believe that when both standing and political question issues are before the court and neither has been resolved definitively in a context readily applicable to the case presented, the court should determine the question of standing first. An analysis of standing requires inquiry only into limitations placed on federal judicial power by article III. The political question issue, on the other hand, requires not only a determination of article III limitations, but also an analysis of the separation of powers doctrine which inevitably carries the inquiry into other articles of the Constitution. *See Flast v. Cohen*, 392 U.S. at 100–01, 88 S.Ct. 1942; *Baker v. Carr*, 369 U.S. 186, 210–11, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). [17] We therefore believe that in this case it is more prudent initially to determine the issue of the standing of those who are seeking to invoke the jurisdiction of the federal court.

## II

At the outset, we note that the standing of plaintiff American Jewish Congress in this case depends upon the ability of its individual members to bring suit. Although the complaint states that the American Jewish Congress is a corporation organized "for the purpose of protecting the civil, political, religious and economic rights of American Jews and working to preserve American democratic and constitutional values of freedom, justice and equality for persons of all races and religions," [18] sheer motivation and commitment to the subject matter of a suit, no matter how strong, cannot substitute for judicially cognizable injury. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 226, 94 S.Ct. 2925; *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Because the American Jewish Congress has alleged no injury to itself as an organization, it can establish standing in this suit "only as [the] representative [ ] of those of [its] members who have been injured in fact, and thus could have brought suit in their own right." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426

14. *Id.* at 9; App. at 11.

15. R.E. 6; App. at 21–23.

16. Some Supreme Court decisions have indicated that standing questions may be decided without regard to the ultimate justiciability of the issues. *See Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Baker v. Carr*, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Other decisions have noted that their discussion of standing is undertaken with the assumption of justiciability in other respects. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Sierra Club v. Morton*, 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See also United States v. Richardson*, 418 U.S. 166, 174 n.6, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

17. *See generally* Albert, *Justiciability and Theories of Judicial Review: A Remote Relationship*, 50 S.Cal.L.Rev. 1139 (1977); Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976); Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv.L. Rev. 1, 7–8 (1959).

18. R.E. 1 at 2; App. at 4.

U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976) (citing *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ The complaint also states that the plaintiffs are suing as representatives of the class of all other American Jews and such other American Jews who are denied economic opportunities in Saudi Arabia solely because they are Jewish.[19] Again, however, the members of the class purportedly represented by the plaintiffs, even if they have suffered injury in fact, may not seek relief in the federal courts through a class action unless the named plaintiffs can establish their own standing. *See O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Likewise, the possibility that other members of the class might have had standing had they brought suit does not thereby confer standing on the named representatives; the actual plaintiffs must show that they have personally suffered an injury redressable by the courts. *Warth v. Seldin*, 422 U.S. at 502, 95 S.Ct. 2197; *see Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 38, 40 n.20, 96 S.Ct. 1917.

We now turn to the pivotal issue of the standing of the individual plaintiffs who are seeking to bring suit in the district court. The complaint states that the individual plaintiffs are American citizens, taxpayers, and persons of the Jewish religion, ancestry, and identity.[20] Two of the named plaintiffs have also allegedly suffered distinct economic disadvantage because of defendants' actions.[21]

■ As citizens per se, plaintiffs clearly lack standing. The only injury to plaintiffs *as citizens* that can be gleaned from the complaint is the alleged general unconstitutional conduct of the defendants. However, the proper observance of constitutional limitations by government officials is an interest shared by all members of the American public. Any injury to that interest is necessarily abstract and lacking in the concreteness required to confer standing. *Ex parte Lévitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *accord, Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 220, 94 S.Ct. 2925. "Until a judicially cognizable injury is shown no other inquiry is relevant to consideration of citizen standing." *Id.* at 227 n.16, 94 S.Ct. at 2935.

■ Plaintiffs have also failed in their complaint to establish standing as taxpayers. In *Flast v. Cohen*, 392 U.S. at 102–03, 88 S.Ct. 1942, the Supreme Court held that, in certain limited circumstances, a plaintiff may have standing to challenge federal action based on his status as a United States taxpayer. In those cases, the plaintiff must be challenging a congressional action under the taxing and spending power of article I, section 8, of the Constitution, and must allege contravention of a specific constitutional limitation on that power. *Id.; see United States v. Richardson*, 418 U.S. 166, 175, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Here, although plaintiffs are challenging the implementation of the Joint Statement as violative of a specific constitutional prohibition on the taxing and spending power, the only other allegation connected with their status as taxpayers is that defendant executive officials have expended governmental funds to effectuate cooperative programs with Saudi Arabia.[22] Such allegations falter in the first stage of the *Flast* test, because they are directed at executive action rather than at a congressional enactment under article I, section 8. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 228, 94 S.Ct. 2925. Thus, the general rule that a federal taxpayer's interest in Treasury moneys is too indeterminate, remote, and abstract to support standing is applicable here. *Frothingham v. Mellon*, 262 U.S. 447, 486–89, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *see United States v. Richardson*, 418 U.S. at 177, 94 S.Ct. 2940.

19. *Id.* at 3; App. at 5.

20. *Id.* at 2–3; App. at 4–5.

21. *Id.* at 2; App. at 4.

22. *Id.* at 7; App. at 9.

■ Another prospective ground for standing of the individual plaintiffs is their status as American citizens of the Jewish religion, ancestry, and identity. In regard to this status, the plaintiffs allege that defendants' promotion and implementation of the Joint Statement have the "purpose and ·effect of deterring and discouraging American Jews from applying for or otherwise seeking employment and other economic opportunities resulting from the Agreement on Saudi-Arabian-United States Cooperation, although but for their religion, ancestry or identity they are qualified therefor." [23] Once again, however, the plaintiffs have fallen short of alleging the type of concrete and direct injury requisite to invocation of federal judicial power. *See Ex Parte Lévitt*, 302 U.S. at 634, 58 S.Ct. 1.

In essence, plaintiffs' allegations of injury to themselves as American Jews is that defendants' actions have a chilling effect on their pursuit of economic opportunities. Although the deterrent or chilling effect of governmental actions has in some cases been held to amount to a constitutional violation and injury in fact, those cases involved regulatory, proscriptive, or compulsory exercises of governmental power to which the complainants were subject. *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).[24] No such regulation, proscription, or compulsion through defendants' actions has been alleged by plaintiffs in this case. Their asserted injury is premised on their general perception of inability to obtain unspecified employment or economic advantage, rather than any actual or demonstrable inability or discouragement fairly traceable to defendants' actions. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ," *id.* at 13–14, 92 S.Ct. at 2325–26, and there-

fore do not present the court with the type of judicially cognizable injury required by article III. *See also O'Shea v. Littleton*, 414 U.S. at 493–96, 94 S.Ct. 669.

■ Plaintiffs' strongest argument for standing in the present case rests on the allegations of specific harm to plaintiffs Louis Kaplan and Martin Watkins. Although my colleagues and I are in agreement that plaintiff Watkins has not alleged sufficient facts to obtain standing, we differ on the issue of the standing of plaintiff Kaplan. Judge Robinson would remand the case to the district court and allow Kaplan to proceed to a proof of his allegations. Judge McGowan, on the other hand, although believing that Kaplan has suffered an injury in fact, agrees with the district court's dismissal of the complaint, basing his affirmance on the want of equity in the complaint as it applies to Kaplan. For the reasons stated below, I believe that neither Kaplan nor Watkins has standing to maintain this suit against the defendants.

Plaintiff Kaplan alleges that he was rejected for a job and believes his rejection was based on his Jewish background rather than any failure in qualification.[25] Watkins alleges that he did not apply for an advertised job because of the application's questions concerning his religion and identity.[26] At first blush, Watkins' asserted injury might appear to suffer from the same deficiency as that allegedly suffered by the American Jews generally. However, in contrast to the general and subjective chill discussed previously, the deterrent effect alleged by Watkins is objective and identifiable: although desiring a specific, advertised position and believing himself fully qualified therefor, he nonetheless refrained from pursuing the opportunity because of the required disclosure of his Jewish back-

**23.** *Id.* at 8; App. at 10.

**24.** On this point, the Supreme Court cited and discussed *Baird v. State Bar of Ariz.*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Lamont v. Post-*

*master General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

**25.** R.E. 1 at 7; App. at 9.

**26.** *Id.* at 8; App. at 10.

ground.[27] In the case of these two individual plaintiffs, I believe that they had indeed suffered concrete injury and that, under certain circumstances, a court could provide them with relief.

The article III "case or controversy" requirement encompasses more than merely an injury to the plaintiff. The plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. at 505, 95 S.Ct. at 2208; *see Linda R. S. v. Richard D.*, 410 U.S. 614, 618–19, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). It is in these areas of causation and redressability that the allegations of plaintiffs Kaplan and Watkins are deficient.

In the recent case of *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 41–42, 96 S.Ct. at 1926, the Supreme Court stated that a federal court is constitutionally empowered "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Here, however, just as in that case, it is "purely speculative" whether Kaplan's job rejection or the deterrent elements of Watkins' application are traceable to the defendants' implementation of the agreement with Saudi Arabia, or instead attributable to decisions made independently by the consortium and the corporation offering the positions. *See id.* at 42–43, 96 S.Ct. 1917. There has thus been no showing that, absent defendants' alleged constitutional infractions, there is a "substantial probability" that plaintiff Kaplan would have been accepted for employment or that plaintiff Watkins would have been encouraged to pursue the application process. *See Warth v. Seldin*, 422 U.S. at 504, 95 S.Ct. 2197. Without such a showing of an "actionable causal relationship" between defendants' actions and plaintiffs' asserted injury, plaintiffs do not have standing to bring suit

against defendants in federal court. *Id.* at 507, 95 S.Ct. 2197.

In *McCabe v. Atchison, Topeka & Santa Fe Railway*, 235 U.S. 151, 164, 35 S.Ct. 69, 59 L.Ed. 169 (1914), the Supreme Court stated that "[t]he desire to obtain [sweeping relief] cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." *Accord, Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. at 221–22, 94 S.Ct. 2925, 2932. Here, plaintiffs Kaplan and Watkins have alleged that, because of their religion and identity, they have been denied certain specific economic opportunities arising under the cooperative programs with Saudi Arabia, although they are qualified to participate therein and wish to do so. To remedy this injury, they seek broad equitable relief prohibiting defendants from further implementing the Joint Statement or any other programs with Saudi Arabia that discriminate against American Jews.

There is no doubt that the termination of the cooperative programs would eliminate any possibility of participation by defendants in the discriminatory practices of the Saudi Arabian government. At the same time, however, such an action would eliminate the very economic advantages in which plaintiffs Kaplan and Watkins have alleged an interest and of which they have allegedly been deprived. There has thus been no showing that the granting of the broad relief requested would properly redress the specific injury alleged by Kaplan and Watkins, or that their individual needs require such relief. *Cf. id.* at 222, 94 S.Ct. at 2932 (in which the Court noted that one purpose of requiring concrete injury in a discrete factual context is to "insure[ ] the framing of relief no broader than required by the precise facts to which the court's ruling would be applied"). The requested remedy in this case is not directed at the alleged

---

27. *Cf. Hailes v. United Air Lines*, 464 F.2d 1006, 1008 (5th Cir. 1972) (an action under the Civil Rights Act of 1964 in which the plaintiff, although not applying for advertised employ-

ment, was found to have standing because he had a "real, present interest in the type of employment advertised," but was deterred from applying by an improper advertisement).

injury to Kaplan and Watkins in being denied specific economic opportunities because of their religion. Instead, it is directed at the subjective "chill" that we have already found too abstract an injury to permit invocation of the federal court's remedial powers.

The allegations of the complaint here do not meet either the causation or redressability requirements of standing, and plaintiffs Kaplan and Watkins have therefore failed to show their right to invoke the power of the federal court.[28] Because the standing of the American Jewish Congress and the class purportedly represented herein depends upon the ability of the individual plaintiffs to seek relief, and because none of the individual plaintiffs has standing, I believe that this case is non-justiciable under article III of the Constitution.

### III

The district court in this case dismissed the complaint on the basis of non-justiciability under the political question doctrine. Although Judge McGowan and I have expressed no opinion on this issue and although we differ on the question of plaintiff Kaplan's standing to sue, we nevertheless agree that the district court's order dismissing the complaint should be

*Affirmed.*

McGOWAN, Circuit Judge, concurring separately:

I concur in affirming the District Court's dismissal of the complaint, and I am in agreement with Judge Tamm's conclusions as to the lack of appellants' standing except as they extend to appellant Kaplan. As Judge Tamm's opinion correctly asserts, the allegations by appellants Kaplan and Watkins are critical to the further maintenance of this suit, which involves essentially the question of whether the United States Government can continue a program in which some of our citizens can readily obtain permission from Saudi Arabia to enter that country for employment under that program, and some cannot. But the answer to that question turns upon the faithfulness and efficacy with which the Executive Branch enforces the Presidential directive of 1975; and the ultimate crunch in that enforcement comes when and if the Saudi government denies a visa and the State Department undertakes, as it is enjoined to do by the Presidential command, to reverse that action.

Watkins alleges only that he chose to forego applying for an advertised job because of the query contained in the application form with respect to his religion. This failure to pursue the matter of employment at all seems to me to leave Watkins with none of the elements necessary to standing to complain in court of the actions of these appellees. His wholly negative course of action gave the Presidential directive no chance whatever to be operative.

Kaplan, however, asserts that he did in fact seek a job from the Mid-Western University Consortium for International Activities, and believes that his failure to get one was based solely on his religion. To this extent he is alleging a federal contractor's violation of the Presidential directive short of the visa stage, and that is an injury in fact imposed contrary to the terms of the directive. But a precondition of his resort to judicial relief based on that allegation would be the prior invocation of aid from the proper authorities in the Executive Branch charged with the enforcement of the directive. Without notice and some opportunity for administrative redress having been provided in the first instance to those authorities, certainly the District Court cannot be called upon to provide the extraordinary remedies of declaratory judgment, injunction, and mandamus against high-ranking officers of the Government engaged in the conduct of our foreign relations. *See* Henkin, *Is There a "Political Question" Doctrine?* 85 Yale L.J. 597, 617–23 (1976).

28. Because of our disposition of this case, we do not need to consider the nonconstitutional "zone of interests" test for standing announced in *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 39 n.19, 96 S.Ct. 1917.

Thus, if Kaplan's allegations are assumed to be capable of being proved in full, the relief he seeks based upon that proof could not properly be given. In these circumstances it is enough for us to note that the complaint is, as to Kaplan, wanting in equity, and to sustain its dismissal on that ground.

**SPOTTSWOOD W. ROBINSON, III,** Circuit Judge, dissenting in part:

Though much of Judge Tamm's discussion of standing is unexceptionable, he concludes that the abrupt dismissal as to Kaplan should be affirmed, primarily on the ground that it is "purely speculative" whether his injuries were directly caused by the governmental activities challenged, and thus that any judicially-ordered relief directed toward that conduct would be unlikely to redress those injuries.[1] Judge McGowan, our concurring colleague, finds that Kaplan has standing but subscribes to affirmance on the ground that "the relief he *seeks* . . . could not properly be given."[2]

I cannot agree with either result. The complaint alleges facts that would establish all the causation legally demanded, and dismissal on the pleadings denied Kaplan the opportunity to prove his allegations in that respect. And because questions of relief are to be decided not on the basis of what a plaintiff requests in his complaint but according to what he legally deserves—and by the trial court in the first instance—I think

the exigencies of remediation presented no occasion for dismissal. I must, then, respectfully dissent.

I

Fairly read,[3] the complaint sets forth two causes of action against appellees, all of whom are officials of the United States Government. The more limited one is that the United States has helped create or has utilized the services of certain nongovernmental institutions and corporations in discharging its responsibilities under the cooperative agreement with Saudi Arabia, and that the organizations with which it has thus become intertwined have discriminated on the bases of religion and ancestry in selecting employees for work in that country.[4] The broader claim is that although the United States endeavors to gain the admission into Saudi Arabia of Jewish Americans employed by participating organizations it may not always be successful,[5] and still it continues its cooperation knowing full well that at sometime it will have to replace one or more.[6]

Jewish citizens thus are allegedly disadvantaged at each of two levels: when the participating organizations choose their employees, and when the United States bows to Saudi Arabian dictates on who may enter to carry out the programs. I agree with my colleagues that under existing law no appellant has standing to launch an attack on the second level, if for no other reason than that none has alleged exclusion at that

1. Principal Opinion (Prin. Op.), —— U.S.App. D.C. at 188, 575 F.2d at 946.

2. Concurring Opinion (Conc. Op.), —— U.S. App.D.C. at 188, 575 F.2d at 948 (emphasis supplied).

3. In scrutinizing a motion to dismiss on the pleadings, the complaint must be construed liberally in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).

4. For example, appellants specifically allege that one appellee, the Administrator of the Agency for International Development, helped to create the Midwest Universities Consortium

for International Activities, that AID uses the Consortium as an instrumentality for implementation of the agreement, and that the Consortium refused to hire Kaplan because of his religion and ancestry. Complaint ¶ 23, Appellants' Appendix (App.) 9.

5. No instance of failure at this level has been brought to our attention.

6. In appellants' words, "it is illegal for the government to enter into an agreement or participate in any program with Saudi Arabia which directly or indirectly results in discrimination by that government against American citizens because of religion." Reply Brief for Appellants at 3.

stage.[7] Contrary to their implicit assumptions, however, the analysis for the latter does not apply equally to the former.

In dealing with initial hiring decisions, Judge Tamm missteps, I believe, by forgetting at what stage this lawsuit was intercepted. He finds, and I agree, that Kaplan[8] "indeed suffered concrete injury and that, under certain circumstances, a court could provide [him] with relief."[9] He concludes, however, that Kaplan faces insurmountable problems of causation and redressability, obstacles that are dealt with under the rubric of the threshold issue of standing.[10]

The difficulty seen with respect to causation is that "it is 'purely speculative' whether Kaplan's job rejection . . . [is] traceable to the defendants' implementation of the agreement with Saudi Arabia, or

---

**7.** Judge Tamm's discussion of citizen, Jewish citizen and taxpayer standing is in accord with the Supreme Court's recent teachings, and no individual asserts that he was hired but then excluded at the second level. Even such an employee might not have standing because of the problem of redressability. If the appellees were enjoined from executing the cooperative agreement unless Saudi Arabia allowed equal entrance to all employees, the "substantial probability," *Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343, 358 (1975), might be that that country would refuse and that no employees at all would be let in. The situation is unlike, for example, that in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where the Eagle Coffee Shoppe's continued refusal to serve blacks would have meant that the Authority would have replaced it with another lessee, and blacks would eventually have been served. In our case, however, no Jewish employee might ever get into Saudi Arabia no matter what the United States would do.

It may therefore be that, at this stage of the evolution of the law of standing, no one can challenge this allegedly unconstitutional conduct, and that is why I deem the explication of citizen and taxpayer standing only facially correct. Perhaps the standing of citizens or taxpayers who have suffered a widely-shared injury and who are interested enough to commit their resources to a suit should be recognized when possibly unlawful action would otherwise go unreviewed. While we surely cannot do away with the constitutional requisite of injury-in-fact, perhaps prudential considerations designed to allow into court only the "best" plaintiffs—in the sense of those with the most serious and individualized injuries—should not completely bar the courthouse doors solely because no one has any greater injury than anyone else. See, *e. g., Nova Scotia Bd. of Censors v. McNeil,* 55 D.L.R.3d 632 (Can. 1975) and *Thorson v. Attorney-General of Canada,* 43 D.L.R.3d 1 (Can. 1974), discussed in Comment, *Opening the Door, Not the Floodgates: An Adaptation of Canadian Standing Criteria to Citizen or Taxpayer Suits in the United States,* 26 Emory L.J. 185 (1977) (under Canadian law, court may grant standing to an affected citizen or taxpayer when the issue is otherwise justiciable and substantial, no other challenger could meet traditional standing rules, alternative methods of attacking validity of the challenged conduct have been exhausted and grave inconvenience will not result).

In the circumstances of this case, we have no need to go beyond the law as it now stands because we do not know that a Jewish employee excluded at the Saudi Arabian border would not have standing under traditional analysis of redressability. It may be, for instance, that the United States could be ordered to implement the agreement so that most if not all of the work to be done by United States citizens could be done in this country, thus remedying the injuries of those Jewish employees who would otherwise be excluded from work in Saudi Arabia. Consequently, more refined analysis of the question of standing to challenge United States conduct at the second level of exclusion can await another day.

**8.** I agree that Watkins may not challenge even the first level of exclusion since he has alleged no governmental involvement either in Bendix Corporation's formulation of its application or in that company's affairs generally. In short, he has not stated a cause of action under the Fifth Amendment because any inequality of treatment did not, for all that is alleged, result from action of the United States Government.

Since I believe that Kaplan has standing, appellant American Jewish Congress would also have standing as a representative of its members who are situated similarly to Kaplan. See Prin. Op., 188 U.S.App.D.C. at ——, 575 F.2d at 943.

**9.** Prin. Op., 188 U.S.App.D.C. at ——, 575 F.2d at 946.

**10.** If the factual allegations of causal nexus are incorrect, that seems like a good and traditional reason for denying relief on the merits. See Tushnet, *The New Law of Standing: A Plea for Abandonment,* 62 Cornell L. Rev. 663, 681 (1977). We are bound, however, by the Supreme Court's determination that it is actually a negation of standing.

## 950

instead attributable to decisions made independently by the consortium . . . ." [11] But Kaplan does allege facts which if proven would establish that his injuries were caused by "the defendants' implementation of the agreement," either directly or because the United States is so involved with the participating institutions that governmental action pervades what might superficially seem to be independent, private decisions. [12] This is not a case in which the complaint merely states a result and then speculates that the challenged governmental conduct might have had something to do with that outcome. The complaint here specifies the facts of how the activity lead to the wrongs in question, and the only possible element of speculation involves whether the alleged facts are correct. Kaplan has not yet had a chance to prove his assertions, and so of course in this limited sense what they say has to be "speculative."

In this milieu, I submit, dismissal as to Kaplan was error. "For purposes of ruling on a motion to dismiss for want of standing," the Supreme Court has recently reminded, "both the trial court and reviewing courts must accept as true all material alle-

gations of the complaint, and must construe the complaint in favor of the complaining party . . . ." [13] Even if Judge Tamm is correct that some degree of specificity is lacking, the only proper course is to remand this litigation to the District Court "to allow or to require [Kaplan] to supply, by amendment to the complaint or by affidavits, further allegations of fact deemed supportive of . . . standing." [14] My colleague is correct that Kaplan must sustain his allegations on causation, but he paradoxically deprives Kaplan of the opportunity to do just that.

### II

Both the leading opinion's handling of redressability and the concurring opinion's elaboration thereon are similarly puzzling. To be sure, appellants seek extensive and "extraordinary remedies," [15] considerably more than could be justified as remediation for injuries suffered at the level of exclusion that they have standing to challenge. [16] But plaintiffs frequently ask for the stars, and a complaint is not dismissable simply because its proof would at most entitle the plaintiff to something less. [17] Judge Tamm

11. Prin. Op., —— U.S.App.D.C. at ——, 575 F.2d at 946. The court here relies primarily upon *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), but the complaint therein failed to allege the factual links between the injury suffered and the challenged action. *Id.* at 44, 96 S.Ct. at 1927, 48 L.Ed.2d at 463–464. The *Eastern Kentucky* complaint fell short because it rested essentially upon "unalleged and unknown facts" to support an inference of causation. *Id.* at 45 n.25, 96 S.Ct. at 1928 n.25, 48 L.Ed.2d at 464 n.25. Appellants have avoided that difficulty here by specifically alleging facts explaining how the conduct complained of led to their injuries.

12. See note 4 *supra.*

13. *Warth v. Seldin, supra* note 7, 422 U.S. at 501, 95 S.Ct. at 2206, 45 L.Ed.2d at 356.

14. *Id.,* 95 S.Ct. at 2206–2207, 45 L.Ed.2d at 356. Of course, if the facts on standing are uniquely within the knowledge or control of the opponent, limited discovery might be appropriate. *Cf. Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962).

A remand to the District Court would necessitate a decision whether that court was correct in ruling that this controversy embraces a nonjusticiable political question. With that I have little difficulty—especially with regard to the claim respecting initial hiring decisions. At that level considerations of foreign policy are not implicated at all, and questions of equal protection are well within the expertise of the judiciary. *E. g., Baker v. Carr,* 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663, 691 (1962). Even were we more deeply involved in adjudication affecting this Nation's international affairs, I would be troubled by a holding that the context of the dispute inexorably immunizes it from judicial review of allegedly unconstitutional action. *E. g., Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

15. Conc. Op., 188 U.S.App.D.C. at ——, 575 F.2d at 947.

16. See text at notes 11–12 *supra.*

17. See, *e. g., Pickus v. Board of Parole,* 165 U.S.App.D.C. 284, 287, 507 F.2d 1107, 1110 (1974); *Norwalk CORE v. Norwalk Redev. Agency,* 395 F.2d 920, 925–926 (2d Cir. 1968); *Kahan v. Rosensteil,* 424 F.2d 161, 174 (3d

recognizes "that, under certain circumstances, a court could provide [Kaplan] with relief"; [18] and, even if it were incumbent upon him to temper his demand for relief, the complaint ends with the traditional boilerplate prayer for "such other and further relief as . . . the Court may [deem] just and proper." [19] That Kaplan has requested an end to our entire participation in the Saudi Arabian program but might only merit, for instance, a decree banning knowing utilization of organizations that discriminate is no reason to leave him empty-handed. To throw out of court plaintiffs who want more than they are likely to get is to ignore human nature, and to create an unrealistic and unwarranted barrier to litigation.[20]

To sum up, then, I believe today's decision distorts the law of standing, and pre-

maturely and needlessly denies Kaplan the opportunity to demonstrate what he alleges. Judge Tamm, I think, not only has abrogated notice-pleading of standing but has further insisted that complaints include proof as well as factual allegations on that score. Judge McGowan has told plaintiffs that they must not ask for more relief than they are sure their complaint warrants on its face. I know of no such requirements, and am unable to perceive any justification for them.

Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Logan v. General Fireproofing Co.,* 521 F.2d 881, 884 n.3 (4th Cir. 1971); *Sapp v. Renfroe,* 511 F.2d 172, 176 n.3 (5th Cir. 1975). Fed.R.Civ.P. 54(c) specifies that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." The purpose of the rule "is to avoid the tyranny of formalism," *Rosden v. Leuthold,* 107 U.S.App.D.C. 89, 92, 274 F.2d 747, 750 (1960), a regime I would not help to reinstate.

**18.** Prin. Op., —— U.S.App.D.C. at 188, 575 F.2d at 946.

**19.** Complaint ¶ 33(6), App. 12.

**20.** Nor can I agree with Judge McGowan that Kaplan has failed to exhaust his administrative remedies. In the first place, I have been told of no process available for enforcement of the presidential statement. Compare *Sohm v. Fowler,* 124 U.S.App.D.C. 382, 385, 365 F.2d 915, 918 (1966) with *A Quaker Action Group v. Morton,* 148 U.S.App.D.C. 346, 353–354, 460

F.2d 854, 861–862 (1971), *on remand,* 362 F.Supp. 1161 (D.D.C.1973), *aff'd in part,* 170 U.S.App.D.C. 124, 516 F.2d 717 (1975), *later appeal,* 182 U.S.App.D.C. 95, 559 F.2d 716 (1977) and *Genuine Parts Co. v. FTC,* 445 F.2d 1382, 1394 (5th Cir. 1971). The statement, moreover, does not speak directly to the first theory of exclusion as I have described it, but instead merely restates the ban on employment discrimination by federal agencies and instructs the Secretary of Labor to order federal contractors to report to the State Department any visa rejections by foreign countries based on exclusionary policies. 11 Weekly Comp. of Pres. Docs: Gerald R. Ford 1305 (Nov. 20, 1975). The statement also reaffirms the general prohibition on job bias by federal contractors, but that in no way provides an adequate remedy for challenges arguing that the Government *itself* encourages the discrimination or at least is entangled with the discriminating entity. *Cf. Mathews v. Eldridge,* 424 U.S. 319, 329–330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18, 29–30 (1976).