GREATER TAMPA CHAMBER OF COMMERCE et al., Appellants,

v.

Neil GOLDSCHMIDT, Secretary of Transportation, et al.

No. 79–1123.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1979.

Decided Feb. 8, 1980.

---

68. 12 U.S.C. § 1847 (1976).

69. In view of our disposition of this case, we see no need to continue the stay ordered June 14, 1979, and it is vacated.

Kopp and Alice Mattice, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before McGOWAN and MacKINNON, Circuit Judges, and PRATT * United States District Judge for the District of Columbia Circuit.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Appellants ask us to reverse a District Court decision which would decline to hold invalid the executive agreement currently in effect between the United States and the United Kingdom by which air travel between the two countries is regulated. Because we find that appellants' complaint fails to allege facts showing a substantial likelihood that a grant of the relief sought would redress the appellants' asserted injuries, we hold that appellants lack standing to bring this action. We therefore vacate the judgment of the District Court and remand the cause with instructions to dismiss the complaint.

I

Because every nation has exclusive sovereignty over the airspace above its territory, *see, e. g.,* Convention on International Aviation ("Chicago Convention"), 61 Stat. 1180, Article 1, international agreements are a prerequisite of international air service. In the Bermuda Agreement of 1946 (Bermuda I), the United States and the United Kingdom entered into such an agreement to govern air travel between the two countries. The British eventually came to feel, however, that Bermuda I permitted more flights on each route than were needed to meet the demand; planes flew with empty seats, and passengers had to be charged high prices. On June 22, 1976, therefore, the United Kingdom notified the United States that it intended to exercise its right to terminate that agreement.

John Cary Sims, Washington, D. C., with whom Robert M. Beckman, Washington, D. C., was on the brief, for appellants.

James R. Atwood, Deputy Legal Adviser, Dept. of State, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Robert E.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

When negotiations for a new agreement began, they were conducted by an American delegation which, after February 24, 1977, was chaired by Alan S. Boyd, whom President Carter appointed Special Representative with the temporary personal rank of ambassador. The delegation included representatives of government agencies (among whom was the Vice Chairman of the Civil Aeronautics Board (CAB)) and advisors from the private sector. On July 23, 1977, Ambassador Boyd and Secretary of Transportation Brock Adams signed, on behalf of the United States, a second Bermuda Agreement (Bermuda II). Because Bermuda II is an executive agreement, not a treaty, it was not submitted to the Senate for ratification.

Under Bermuda I, only eleven cities— New York, Washington, D.C., Philadelphia, Baltimore, Detroit, Chicago, Boston, Miami, San Francisco, Seattle, and Los Angeles— were "gateways." (Gateways are cities from which nonstop flights may travel to the United Kingdom.) Under Bermuda II, Baltimore and Washington have become a single gateway, and Anchorage, Atlanta, Dallas/Fort Worth, Houston, and a city which will later be chosen have been added to the list of gateways. Bermuda I imposed no bilateral restrictions on the number of airlines which could fly from a gateway. Under Bermuda II, however, the United Kingdom may limit thirteen gateways to nonstop service by only one American carrier, and may limit two gateways to nonstop service by two American carriers. On the recommendation of the CAB, the President has awarded such "dual designation" to New York and Los Angeles.

Appellants are the Greater Tampa Chamber of Commerce; the Tampa Bay Area International Air Service Task Force; the Aviation Consumer Action Project; Hillsborough County, Florida; the City of Cleveland, Ohio; and eleven individuals who use international air service. On March 23, 1978, they filed a complaint in the District Court alleging that Bermuda II is an invalid agreement and asking for declaratory and injunctive relief against the Secretary of Transportation, the Secretary of State, and the United States. Appellants identify as the injury which motivates the suit that Bermuda II is "anti-competitive" and will therefore diminish the quantity and quality of trans-Atlantic air service available to them. They identify as the legal failing of the agreement several "procedural" flaws in its execution. Appellants' arguments in the latter respect may be summarized as follows.

First, Bermuda II is properly a treaty, and not an executive agreement, and therefore it should have been ratified by the Senate. Bermuda II must be a treaty because only treaties can override an act of Congress, and Bermuda II conflicts with the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq. Specifically, the agreement conflicts with those portions of the Act which

(1) mandate competition in air transportation "to the extent necessary to assure the sound development of an air-transportation system," 49 U.S.C. § 1302(d);[1]

(2) provide that

[n]o term, condition, or limitation of a certificate shall restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service as the development of the business and the demands of the public shall require . . .

49 U.S.C. § 1371(e)(4); and

(3) require that, in approving rates, the CAB consider those factors specified by 49 U.S.C. § 1482(j)(5).

Even if these conflicts between Bermuda II and the Act could be resolved, "Bermuda II would require Senate ratification because it represents an intrusion by the President into the field of foreign commerce, where he has no independent constitutional authority . . . ." Appellants' Brief at 12.

1. After Bermuda II was signed, Congress passed the Airline Deregulation Act of 1978, which amended 49 U.S.C. § 1302(d) and ex-

pressed more emphatically the importance of "competitive market forces." 49 § 1302(a)(4).

Second, since 22 U.S.C. § 901(c) permits the President to confer the personal rank of ambassador only "in connection with special missions for the President of an essentially limited and temporary nature of not exceeding six months," and since this was not such a mission, Mr. Boyd's appointment should have been submitted to the Senate for confirmation.

Third, appellees failed to carry out their duty under 49 U.S.C. § 1462 to advise and consult with the CAB while Bermuda II was being negotiated.[2] Nor did appellees consult with leaders of Congress to the extent prescribed in State Department Circular No. 175.

Fourth, neither Mr. Boyd nor Secretary Adams was properly authorized to sign Bermuda II for the United States.

On November 30, 1978, the District Court issued a memorandum opinion and an order. The opinion concluded that, despite appellees' arguments to the contrary, appellants had standing because they were injured by a diminution in air services appellants contend Bermuda II caused. The order granted appellees' request for summary judgment as to the questions of (1) whether Bermuda II and the Federal Aviation Act conflict; (2) whether Ambassador Boyd and Secretary Adams were authorized to sign the agreement; and (3) whether the President properly appointed Ambassador Boyd. The order granted appellees' motion to dismiss as nonjusticiable "political questions" the issues of (1) whether Bermuda II should have been submitted to the Senate for ratification and (2) whether appellees adequately consulted with the CAB during negotiations.

## II

While the District Court may have been correct in concluding that appellants now receive less adequate air service than they might have received under Bermuda I, we cannot agree that that conclusion resolves the question of whether appellants have standing to bring this suit. The District Court did not evaluate appellants' standing in terms of that aspect of current Supreme Court standing doctrine which holds that, absent a substantial likelihood that a federal court can redress the injury a plaintiff claims to have suffered, the plaintiff has no standing to invoke the court's power. To this "redressability" principle, and to appellants' failure to establish that they meet its standards, we now turn.

## A

"In its constitutional dimension," the Supreme Court has explained, "standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). A federal court may not decide a case in which a plaintiff has not " 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99, 95 S.Ct. at 2205 (emphasis original), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). In several recent cases the Court has reiterated that "when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 103 (1976). These recent cases define the test for the redressability aspect of standing as whether "there is a 'substantial likelihood' that the relief requested will redress the injury claimed . . . ." *Duke Power Co. v. Carolina En-*

---

2. That section provides:

    The Secretary of State shall advise the Secretary of Transportation, the [Civil Aeronautics] Board, and the Secretary of Commerce, and consult with the Secretary of Transpor-
    tation, Board, or Secretary of Commerce, as appropriate, concerning the negotiations of any agreement with foreign governments for the establishment or development of air navigation, including air routes and services.

*vironmental Study Group*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631, n. 20, 57 L.Ed.2d 595 (1978). The following survey of these cases reveals the seriousness with which the Supreme Court has taken that test and our consequent obligation to apply it to this case.

In *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the Court held that the mother of an illegitimate child had no standing to seek to enjoin the "discriminatory application" of a Texas statute which penalized with a jail sentence a parent who refused to support his child. The Texas courts construed the statute as imposing no duty on the parent of an illegitimate child; and the mother alleged that she had been injured by the refusal of the local district attorney to prosecute the father of her child. The Court said that, "in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks to justify judicial intervention." *Id.* at 617–18, 93 S.Ct. at 1149. Appellant was unable to show "that her failure to secure support payments results from the nonenforcement, as to her child's father," of the statute. *Id.* at 618, 93 S.Ct. at 1149. Further, since "the statute creates a completed offense with a fixed penalty as soon as a parent fails to support his child . . .," appellant could not show that she would receive payments if the Court granted her the relief she sought: "The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative." *Id.*

In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), appellants— persons of low and moderate income— claimed that they wished to live in Penfield, New York, but were prevented from doing so by the town's zoning ordinance, an ordinance they argued violated their constitutional and statutory rights.[3] The Court set forth the showing which those appellants

(who were petitioners before the Supreme Court) had to make to establish standing:

> Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.

*Id.* at 504, 95 S.Ct. at 2208. The court decided that the plaintiffs' ability to secure relief depended on whether builders could and would construct inexpensive housing in Penfield. The Court found no evidence in the record of any housing projects which "would have satisfied petitioners' needs at prices they could afford, or [any evidence] that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners." *Id.* at 506, 95 S.Ct. at 2209. Instead, petitioners relied on "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." *Id.* at 507, 95 S.Ct. at 2209–2210. In sum, the plaintiffs' inability to secure housing in Penfield was due to the economics of the housing market, and not to the town's zoning practices. Since the Court could not grant relief which altered those economics, the plaintiffs lacked standing.

In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 103 (1976), indigents brought suit alleging that the Internal Revenue Service's Revenue Ruling 69–545, which granted favorable tax treatment to nonprofit hospitals even though they offered indigents only emergency-room services, violated the Internal Revenue Code and the Administrative Procedure Act. The Court assumed, *arguendo*, that some such hospitals denied services to indigents. However, the Court could not infer from

---

**3.** Taxpayers of the nearby city of Rochester and several associations variously concerned with housing problems were also appellants.

The Court held that none of the plaintiffs had standing. *See* note 7 *infra*.

the indigents' complaint that "the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire." *Id.* at 42, 96 S.Ct. at 1926. Rather it was

> speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services.

*Id.* at 43, 96 S.Ct. at 1926. Since "[p]rior decisions of this Court establish that unadorned speculation will not suffice to invoke the federal judicial power," *id.* at 44, 96 S.Ct. at 1927, the indigents lacked standing to press their claim.

### B

■ We face here the same problem the Supreme Court confronted in *Linda R.S., Warth,* and *Eastern Kentucky*: Appellants' complaint does not allege facts which give rise to a "substantial likelihood" that, were a court to grant appellants the relief they request, their injury would be redressed. To see why this is so, let us suppose that, as

---

**4.** Article 46 of the Vienna Convention of the Law of Treaties (Senate Exec.L., 92d Cong., 1st Sess. (1971)) provides:

1. A State may not invoke the fact that its consent to be bound by a treaty has been expressed in violation of a provision of its internal law regarding competence to conclude treaties as invalidating its consent unless that violation was manifest and concerned a rule of its internal law of fundamental importance.

2. A violation is manifest if it would be objectively evident to any State conducting itself in the manner in accordance with normal practice and in good faith.

**5.** "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must con-

---

appellants desire, a court declared Bermuda II invalid and enjoined appellees from giving the agreement effect until the Senate ratified it.

First, were the Senate to ratify the agreement, appellants' circumstances would be exactly what they are now. For appellants to have any prospects of relief, the Senate would have to decide that, despite arguments that international law (and the practicalities of foreign affairs) may already bind the United States to Bermuda II,[4] it would not ratify the agreement. Even the most generous reading of the complaint[5] reveals no "substantial likelihood" that the Senate would so decide.

Second, even if the Senate declined to ratify the agreement, there would remain the fact that the United Kingdom completely controls landing rights within its boundaries. The complaint proffers no evidence that, were the agreement renegotiated, the United Kingdom would be amenable to terms other than those of Bermuda II. On the contrary, when appellants' counsel was asked at oral argument about the success of an American attempt to secure British approval of dual designation for three cities instead of the two Bermuda II sets as the maximum Britain must accept, J.A. 57–58, 128, he conceded: "My understanding is that the British are perfectly willing to let us ask for anything we want in the way of a modification of Bermuda II, but they're not willing to agree to any modification."[6]

---

strue the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**6.** Even if the United Kingdom agreed to alter Bermuda II, nothing in appellants' complaint leads us to believe that appellants would necessarily find the new terms preferable to the old. And while appellants submit an affidavit from an Assistant Secretary of National Airlines which states that "National would operate nonstop in [the Tampa-London] market were it able to do so," J.A. 106, we have been given no reason to suppose that, under the terms of a Bermuda III, airlines would be willing to provide the services appellants seek.

Indeed, it appears that, even under the liberal terms of Bermuda I, only one of the six cities whose service is at issue in this action received anything more than intermittent competitive

## C

Appellants urge that *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), commands a result different from the one we reach. In *Arlington Heights*, the MHDC planned to build low- and moderate-cost housing but was kept from doing so by zoning which, the MHDC claimed, violated the Fourteenth Amendment and the Fair Housing Act of 1968. Appellants quote the following passage from the Court's opinion:

> Here there can be little doubt that MHDC meets the constitutional standing requirements. *The challenged action of the petitioners stands as an absolute barrier to constructing the housing MHDC had contracted to place on the Viatorian site.* If MHDC secures the injunctive relief it seeks, that barrier will be removed. *An injunction would not, of course, guarantee that Lincoln Green will be built.* MHDC would still have to secure financing, qualify for federal subsidies, and carry through with construction. But all housing developments are subject to some extent to similar uncertainties. When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy. MHDC has shown an injury to itself that is "likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org., supra,* 426 U.S. at 38, 96 S.Ct. at 1924.

*Id.* at 261–62, 97 S.Ct. at 561, *quoted in* Appellants' Brief at 27 (footnote omitted) (emphasis added by appellants). However, as the last sentence quoted makes plain, the Court in *Arlington Heights* did not abandon the principle of redressability. Rather, the clear import of the quoted passage is simply that MHDC's "detailed and specific" project was sufficiently far along to create a substantial likelihood that, zoning permitting, the project would be completed.[7]

■ Appellants argue that, because the Supreme Court in *Arlington Heights* speaks of an "absolute barrier," any litigant who can allege that he is seeking to remove an "absolute barrier" to the relief he ultimately desires must have standing. But *Arlington Heights* works no such change in the Court's standing doctrine. Arlington Heights' zoning was the *only* "absolute barrier" to the project, and when it was removed, there was the requisite likelihood that, in the normal course of events, the project would be completed. Here, even if a court removed the barrier of Bermuda II, the two barriers we described above would

---

service. Tampa and Cleveland, of course, were not gateways under Bermuda I. Between 1970 and 1977, only Boston received nonstop trans-Atlantic service from two airlines. Baltimore received no nonstop trans-Atlantic service at all after October 1970. Philadelphia received summer service from two airlines until 1974, winter and summer service by one airline until the summer of 1976, and after that no nonstop trans-Atlantic service. Although that service was offered from San Francisco by two carriers in the summers of 1972 and 1977, no such service was provided between those two periods. Affidavit of Raymond A. Young, III, Deputy Assistant Secretary for Policy and International Affairs, United States Department of Transportation, J.A. 74–75.

7. The MHDC had entered into a 99-year lease and accompanying sale agreement for a building site in Arlington Heights. The lease was effective immediately and the sale was contingent upon securing zoning clearances and federal housing assistance. *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 256, 97 S.Ct. 555, 558, 50 L.Ed.2d 450 (1977). Further, the MHDC had "expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning." *Id.* at 262, 97 S.Ct. at 562. The relevant comparison is with the situation of the housing councils which the Court in *Warth v. Seldin* held did not have standing. 422 U.S.C. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Their complaints, with one exception, failed to "suggest that any of these groups has focused its efforts on Penfield or [had] any specific plan to do so." *Id.* at 516–17, 95 S.Ct. at 2214. The exception, the Penfield Better Homes Corp., had applied for a zoning variance three years before the complaint was filed. However, the complaint did not "allege that the Penfield Better Homes project remained viable in 1972 when this complaint was filed, or that respondents' actions continued to block a then-current construction project." *Id.* at 517, 95 S.Ct. at 2214.

remain, and there would not be a likelihood that appellants would secure the air services they seek.

Appellants also contend that *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), "lends strong support" to their position. They invoke the following paragraph from that case:

> The second attack on the District Court's finding of a causal link warrants only brief attention. Essentially the argument is, as we understand it, that Price-Anderson is not a "but for" cause of the injuries appellees claim since, if Price-Anderson had not been passed, the Government would have undertaken development of nuclear power on its own and the same injuries would likely have accrued to appellees from such government operated plants as from privately operated ones. Whatever the ultimate accuracy of this speculation, it is not responsive to the simple proposition that private power companies now do in fact operate the nuclear powered generating plants injuring appellees, and that their participation would not have occurred but for the enactment and implementation of the Price-Anderson Act. Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.

*Id.* at 77–78, 98 S.Ct. at 2633, *quoted in* Appellants' Brief at 29. *Duke Power,* however, explicitly reaffirmed the "substantial likelihood" standard for redressability. *Id.* at 75 n. 20, 98 S.Ct. at 2631 n. 20. Further, to say that a plaintiff need not negate "speculative and hypothetical possibilities" is not to relieve plaintiffs of the obligation of demonstrating that redress may be had. Appellants, as we said above, have not met that obligation: insofar as there is a "speculative and hypothetical" possibility in this case, it is that a court could bring about redress of appellants' injuries.

Finally, appellants attempt to distinguish our decision in *American Jewish Congress v. Vance,* 188 U.S.App.D.C. 58, 575 F.2d 939 (D.C.Cir. 1978). One Watkins, a plaintiff in that case, had alleged that he was deterred from applying for a job with an American corporation which was to perform work in Saudi Arabia pursuant to an agreement between the American and Saudi governments. Saudi Arabia's policy was to exclude Jews from the country, and Watkins asserted that he did not apply for the job because the application would have revealed that he was Jewish and thus subject to the exclusionary policy. Watkins (and others) brought suit against officials of the United States government, alleging that the agreement with Saudi Arabia "so involves them in Saudi Arabia's exclusionary policies as to constitute illegal conduct in violation of the first and fifth amendments and article VI of the Constitution." *Id.* 188 U.S.App.D.C. at 61, 575 F.2d at 942.

This court held that Watkins did not have standing. As appellants themselves phrase our holding:

> Even if the plaintiffs in *American Jewish Congress* had prevailed, there would have been an independent obstacle absolutely preventing them from benefiting from the lawsuit, since Saudi Arabia would have refused to grant visas to Jewish employees.

Appellants' Reply Brief at 29. *Mutatis mutandis,* this passage describes with some precision the situation in the case before us. Even if appellants prevailed, the independent obstacles of possible Senate approval of Bermuda II and of the United Kingdom's control over its own airspace would remain. While these may not be "absolute" obstacles, nothing in appellants' complaint leads us to expect that they would be overcome.

### III

Appellants have failed to show that this court can redress the injury appellants aver they have suffered. "Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Eastern Ken-*

*tucky, supra,* 426 U.S. at 38, 96 S.Ct. at 1924. Accordingly, we remand the cause to the District Court with instructions to dismiss the complaint on the ground that the complainants lack standing.

*It is so ordered.*