**Henry S. REUSS, Appellant,**

v.

**John J. BALLES et al.**

**No. 77–1012.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1977.

Decided July 7, 1978.

Rehearing Denied Aug. 14, 1978.

Certiorari Denied Nov. 27, 1978. See 99 S.Ct. 598.

J. Skelly Wright, Chief Judge, dissented and filed opinion.

---

51. *E. g., Platt v. Lecocq,* 158 F. 723 (8th Cir. 1907).

52. 49 U.S.C. § 316(b) expressly authorizes "just and reasonable regulations."

Grasty Crews, II, Washington, D. C., for appellant.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Leonard Schaitman, Atty., Dept. of Justice, and Earl J. Silbert, U. S. Atty., Washington, D. C., were on brief, for appellee.

Before WRIGHT, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

Dissenting opinion filed by J. SKELLY WRIGHT, Chief Judge.

TAMM, Circuit Judge:

Appellant Henry S. Reuss, a United States Congressman from Wisconsin, commenced this action in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief from the allegedly unconstitutional composition of the Federal Open Market Committee, an integral component of the Federal Reserve System. The district court (Parker, J.) dismissed the complaint, finding that appellant lacked standing to sue, both in his capacity as a congressman and as an owner of certain marketable bonds. *Reuss v. Balles,* 73 F.R.D. 90 (D.D.C.1976). We affirm.

I

The Federal Reserve System was created by Congress in 1913 as this nation's central bank. Unlike similar institutions in other countries, it is not a single entity, but rather a composite of several parts, both public and private, organized on a regional basis with a central governmental supervisory authority. The System consists of a seven-member Board of Governors, twelve regional Federal Reserve Banks, the Federal Open Market Committee (FOMC), the Federal Advisory Council, and approximately 6000 privately owned, commercial banks.[1] The key to success of the System is harmonious interaction between and among these component parts.

The function of the Federal Reserve System in the conduct of monetary policy is to assist in achieving national economic goals through its influence on the availability and cost of bank reserves, bank credit, and money. The three primary instruments employed by the System in the formulation

---

1. *See* 12 U.S.C. §§ 221–522 (1976); Joint Appendix (J.A.) at 36.

and execution of general monetary policy are: 1) open market operations; 2) regulation of member bank borrowings from the Federal Reserve Banks; and 3) establishment of member bank reserve requirements. The most flexible, and perhaps the most important, of these monetary policy tools is the open market instrument.[2]

Since the inception of the Federal Reserve System, the twelve Federal Reserve Banks have been statutorily empowered to participate in a wide variety of financial transactions in the open market.[3] In one of the earliest cases to discuss the functioning of the Federal Reserve, Judge Augustus N. Hand summarized these open market operations as follows:

> [The Federal Reserve Banks may] purchase and sell in the open market at home or abroad cable transfers and bankers' acceptances and bills of exchange of the kinds and maturities eligible for rediscount. They may deal in gold coin and bullion at home and abroad; by and sell, at home and abroad, bonds and notes of the United States, and bills, notes, revenue bonds, and warrants with a maturity from date of purchase of not exceeding six months, issued by any state, county, district, political subdivision, or municipality in the United States . . .. They may purchase from member banks, and sell, bills of exchange arising out of commercial transactions, and may "establish from time to time, subject to review and determination by the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank for each class of paper, which shall be fixed with a view of accommodating commerce and business." They may establish accounts with other Federal Reserve Banks . . . [and] may open accounts and establish agencies in foreign countries for the purpose of purchasing, selling, and collecting bills of exchange. They may purchase and sell in the open market, either from or to domestic banks,

firms, corporations, or individuals, acceptances of Federal Intermediate Credit Banks and of national agricultural credit corporations . . ..

> The foregoing provisions enable the Federal Reserve Banks, without waiting for applications from their member banks for loans or rediscounts, to adjust the general credit situation by purchasing and selling in the open market the class of securities that they are permitted to deal in. The power "to establish from time to time, subject to review and determination of the Federal Reserve Board, rates of discount to be charged by the Federal Reserve Bank," appears in the act . . . with the open market powers. The two powers are correlative and enable the Federal Reserve Banks to make their rediscount rates effective. The sale of securities does not lessen the total amount of credit available, but, by necessitating payment to the Federal Reserve Banks, increases available credit in their hands, "with a view of accommodating commerce and business," as provided by the act.

*Raichle v. Federal Reserve Bank,* 34 F.2d 910, 913–14 (2d Cir. 1929).

Four years after the *Raichle* decision, in recognition of the growing importance of open market operations as an element of national monetary policy, Congress created the FOMC.[4] The function of the FOMC was to initiate policy recommendations to the Board of Governors for the conduct of open market operations, and the Federal Reserve Banks were, for the first time, prohibited from transacting in the open market except in accordance with Board regulations. Each Reserve Bank was left free, however, to decline to participate in operations approved by the Board.

The permissive nature of this initial structure proved to be ineffectual, and, in 1935, Congress elevated the role of the

---

2. *See* J.A. at 39; Brief for the Plaintiff-Appellant at 18 & n. 23.

3. *See* 12 U.S.C. §§ 348a, 353–359 (1976).

4. Banking Act of 1933, ch. 89, § 8, 48 Stat. 168.

FOMC to its present dominant position.[5] In unequivocal language, 12 U.S.C. § 263(b) (1976) states:

No Federal Reserve bank shall engage or decline to engage in open-market operations under sections 348a and 353 to 359 of this title except in accordance with the direction of and regulations adopted by the Committee. The Committee shall consider, adopt, and transmit to the several Federal Reserve banks, regulations relating to the open-market transactions of such banks.

Also since 1935, the FOMC has been composed of the seven members of Board of Governors, who are appointed by the President with the advice and consent of the Senate, and five representatives of the Federal Reserve Banks, elected annually by the boards of directors of the Banks. 12 U.S.C. § 263(a) (1976). Initially, there were no restrictive qualifications for the appointment of these latter five members, but, in 1942, Congress mandated that they be either presidents or first vice presidents of the Federal Reserve Banks,[6] individuals who are selected with the approval of the Board of Governors. Thus, the FOMC now consists of seven members who hold their offices by virtue of presidential appointments confirmed by the Senate, and five members who hold their offices subject ultimately only to the approval of the Board of Governors.

On June 21, 1976, appellant brought this action in the district court, seeking a declaratory judgment that 12 U.S.C. § 263(a) is unconstitutional because the five Reserve Bank members of the FOMC are not appointed pursuant to the Appointments Clause of the Constitution.[7] He reasoned, in part, that, since these individuals are "exercising significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 685, 46 L.Ed.2d 659 (1976) (per curiam), they are thus "Officers of the United States" who are required to be appointed by the President subject to Senate confirmation. He also sought an injunction prohibiting the Reserve Bank members from serving on the FOMC, and prohibiting the Federal Reserve Banks from complying with FOMC directives and regulations considered or adopted while any Reserve Bank member was serving on the FOMC.[8] Defendants to the action included the five Reserve Bank members of the FOMC, and their alternates, and the twelve Federal Reserve Banks.

Appellant averred that he had standing to sue in two capacities. As a legislator,[9] he claimed that the power conferred on him by article I, section 2, of the Constitution to initiate impeachment proceedings against civil officers of the United States is diminished because the Reserve Bank members of

5. Banking Act of 1935, ch. 614, § 205, 49 Stat. 705.

6. Act of July 7, 1942, ch. 488, § 1, 56 Stat. 647.

7. Article II, section 2, clause 2, states, in pertinent part:

[The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

8. J.A. at 14. Because appellant sought to enjoin enforcement of a federal statute as being repugnant to the Constitution, application was made to convene a three-judge court pursuant to 28 U.S.C. § 2282 (1970), which was still in force at the time this action was filed. J.A. at 15; see Pub.L. No. 94–381, § 2, 90 Stat. 1119 (Aug. 12, 1976). Judge Parker correctly ruled that "a single judge may first determine whether the court has jurisdiction to hear the case before requesting a three-judge court. *Gonzalez v. Automatic Employees Credit Union*, 419 U.S. 90, 100, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974)." *Reuss v. Balles*, 73 F.R.D. 90, 92 (D.D.C.1976); see *Ex parte Poresky*, 290 U.S. 30, 31–32, 54 S.Ct. 3, 78 L.Ed. 152 (1933); *Bryan v. Federal Open Mkt. Comm.*, 235 F.Supp. 877, 880 (D.Mont.1964).

9. Congressman Reuss represents Wisconsin's fifth congressional district. He serves as Chairman of the Committee on Banking, Finance and Urban Affairs.

the FOMC, as currently selected, are "jurisdictionally immune to the impeachment process;"[10] he also claimed that improper delegation of responsibilities to the FOMC resulted in a usurpation of his powers, under article I, section 8, of the Constitution, to coin and regulate the value of money, to regulate commerce, and to borrow money on the credit of the United States.[11] As owner of "certain marketable bonds" valued in excess of $20,000, he maintained that actions taken by the FOMC might result in his being deprived of property without due process of the law.[12]

On motion by the Government,[13] Judge Parker dismissed the complaint for lack of jurisdiction over the subject matter. He found that appellant had failed to demonstrate standing either as a congressman or bondholder. With regard to the latter capacity, he stated, among other reasons, that appellant "failed to allege any causal connection between the allegedly improper selection of the Reserve Bank representatives . . . and any possible impact on the value of his securities. Thus . . . it is not clear that the alleged injury would be redressed by a favorable decision." *Reuss v. Balles*, 73 F.R.D. at 98. Appellant's argument concerning his diminished legislative powers was rejected, in part, for identical reasons. *See id.* at 96–97; note 19 *infra*, and accompanying text. Finally, his impeachment claim was dismissed as "remote, conjectural and insufficient," *id.* at 96. This appeal ensued.

## II

■ The question of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Although appellant's status as a legislator introduces somewhat unique considerations into the case at bar, we must bear in mind that there are no special standards to be employed in analyzing legislator standing questions. *Harrington v. Bush*, 180 U.S.App.D.C. 45, 59, 553 F.2d 190, 204 (1977). Thus, no matter how inclined we may be toward appellant's position on the merits, we must first satisfy ourselves that he "has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).[14]

---

10. Brief for the Plaintiff-Appellant at 12. Appellant's reference to this ground in his amended complaint was somewhat less precise. *See* J.A. at 12; Brief for the Plaintiff-Appellant at 12 n.4. However, since the impeachment theory was fully developed in, and ruled upon by, the district court, and briefed and argued on appeal, we will treat it as having been properly presented. *See generally Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

One principal reason that appellant amended his original complaint was to advance a theory, related to the impeachment theory, that his ability to "participate in the process of selection of officers of the United States . . . through negotiation with representatives of the Senate" had been diminished. J.A. at 12. The district court ruled against appellant on this theory, *Reuss v. Balles*, 73 F.R.D. at 97, and he did not present it in this appeal. *See* Brief for the Plaintiff-Appellant at 1.

11. J.A. at 12.

12. *Id.* at 6, 12–13.

13. *Id.* at 26.

14. An increasing number of congressmen and senators are repairing to the courts, either instead of, or after, resorting to the political process, to challenge executive actions and policies. *See, e. g., Edwards v. Carter*, 189 U.S.App.D.C. 1, 580 F.2d 1055 (1978). Such cases, because of their almost inevitable political overtones, present the courts with some very difficult jurisdictional questions.

As indicated in our discussion in *American Jewish Congress v. Vance*, 188 U.S.App.D.C. 58, 575 F.2d 939 (1978), concerning the interrelationship between standing to sue and the political question doctrine, we believe that, in general, the standing inquiry in cases such as these should be resolved first. 188 U.S.App. D.C. at 62–63, 575 F.2d at 943–944. If there is a determination of lack of standing, the case should be dismissed on that ground.

However, we are mindful that these cases often present precisely those considerations that may require resolution by resort to the political question doctrine. *See Harrington v.*

In making this determination, we must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206. Thus, for purposes of reviewing the district court's dismissal of the complaint, we shall assume that the five Federal Reserve Bank representatives are serving on the FOMC illegally, in that they should have been appointed by the President with the advice and consent of the Senate. The "critical question" that remains, however, is "whether this assumed illegality has *resulted* in any judicially cognizable injury" to appellant. *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 35, 553 F.2d 176, 180 (1977). With these general consid-

erations in mind, we turn now to an analysis of each of appellant's asserted bases for standing.

**A.  Standing as a Legislator.**

■ Although it certainly has had the opportunity to be more expansive, this court has exercised a high degree of caution in delimiting the scope of legislator standing: In only one case, *Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974), have we *held* that a legislator had standing to sue.[15] This apparent parsimony derives not from any preconceived notions concerning such cases, but rather from an awareness that, as noted above, a legislator receives no special consideration in the standing inquiry.

---

*Bush*, 180 U.S.App.D.C. 45, 49, 553 F.2d 190, 194 n.6 (1977); *Bryan v. Federal Open Mkt. Comm.*, 235 F.Supp. at 882; Note, *Congressional Access to the Federal Courts*, 90 Harv.L.Rev. 1632, 1643–52 (1977). Thus, if the court believes the plaintiff *does* have standing to sue, but has presented a nonjusticiable political question, it should dismiss the complaint on that latter ground. Any discussion of standing, therefore, would be rendered pure dictum, *see Harrington v. Bush*, 553 F.2d at 207; note 15 *infra*, and, because our overriding concern is to avoid constitutional determinations unless essential to the disposition of the case, *see Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (per curiam), the court should consider eliminating, or certainly limiting, these ancillary standing discussions.

Finally, if the court believes that the plaintiff has standing and has not presented a political question, it may, nonetheless, because of the unusual circumstances of the case, dismiss for want of equity. *American Jewish Congress v. Vance* (McGowan, J., concurring separately); Note, *Congressional Access to the Federal Courts, supra*, at 1652–54.

**15.** In *Mitchell v. Laird*, 159 U.S.App.D.C. 344, 488 F.2d 611 (1973), where the complaint was dismissed because a political question was presented, we indicated, in dictum only, that the congressmen in question had standing to sue because the declaratory judgment sought would "bear upon" their constitutional duties to impeach executive officials, to appropriate funds, and to formulate subsequent legislation. *Id.* 159 U.S.App.D.C. at 347, 488 F.2d at 614; *see* note 14 *supra*. *But see Harrington v. Bush*, 553 F.2d at 207–09; *Congressional Access to the Federal Courts, supra* note 15, at 1638 & n.43.

This court has been involved to a limited degree in two other cases in which legislators were found to have standing to sue. In *Wil-*

*liams v. Phillips*, 360 F.Supp. 1363 (D.D.C.), stay denied, 157 U.S.App.D.C. 80, 482 F.2d 669 (1973), a number of senators were found to have standing to challenge the appointment of an acting agency director as circumventing their right to participate in the confirmation of federal officers. This court did not rule on the standing determination, 157 U.S.App.D.C. at 82, 482 F.2d at 671, which, to a significant degree, was based upon the now-questionable *Mitchell* "bear upon" standard. 360 F.Supp. at 1366. In *Pressler v. Simon*, 428 F.Supp. 302 (D.D.C.1976) (three-judge court) (per curiam), *aff'd mem. sub nom. Pressler v. Blumenthal*, 434 U.S. 1028, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978), a congressman prevented by application of federal statutes from voting on the ascertainment of congressional salaries, a legislative duty mandated by the Ascertainment Clause, was held to have standing to sue because his vote had been impaired; the district court, however, ruled against the plaintiff on the merits. Justice Rehnquist, concurring in the Supreme Court's affirmance, thought it important

to point out that such affirmance does not necessarily reflect this Court's agreement with the conclusion reached by the District Court on the merits of the Ascertainment Clause question. The District Court decided that appellant did have standing to litigate this issue by virtue of the fact that he was a Member of Congress, but decided the issue against him on the merits. *Our "unexplicated affirmance" without opinion could rest as readily on our conclusion that appellant lacked standing to litigate the merits of the question* as it could on agreement with the District Court's resolution of the merits of the question.

*Id.* (emphasis added).

In *Kennedy*, a United States senator was held to have standing to sue to challenge the legality of an attempted pocket veto of a bill for which he had voted; the impairment of the efficacy of his vote was found to demonstrate sufficient injury in fact. Even in that case, however, we stressed that the vindication of the effectiveness of his vote was the senator's most "essential" interest, and that it was asserted "in the context of a particular dispute about specific legislation." *Id.* 167 U.S.App.D.C. at 198, 511 F.2d at 436; *see Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). Neither of the legislator standing theories in the instant case presents a situation where appellant's vote will be derogated, or a situation sufficiently analogous to warrant a determination of standing to sue.

### 1. Currency, Commerce, and Borrowing Powers.

The essence of this theory is that, without presidential appointment of all its members, the FOMC is essentially a private group to which the specified legislative functions have been improperly delegated. If this is true, appellant reasons, then actions taken by the FOMC usurp powers still belonging to the Congress, thus injuring appellant as a member of that body.[16]

As appellant correctly notes,[17] the district court's analysis of this theory was, in part, somewhat misconceived. By indicating at the outset of its analysis that there is no improper delegation because the FOMC is not a completely private group,[18] the court was, in effect, rendering a decision on the merits, thus exceeding its jurisdiction in

light of the request for a three-judge court. Instead, the court should have assumed that the FOMC is a private group exercising improperly delegated powers, and then asked whether that fact injured an interest of the appellant. In our view, it does not.

The interest sought to be protected by the appellant under this theory is his role in the formulation and regulation of general monetary policy. The defect in his theory, however, is that even if we were to declare, in effect, that all members of the FOMC had to be presidential appointees, the same responsibilities currently delegated to the FOMC would remain so delegated. The fact that appellant's role vis-à-vis monetary policy would in no way be enhanced by such a declaration indicates that his legislative powers, including relevant votes either in committee or on the floor, are not currently adversely affected in any respect; there is, therefore, no injury in fact that would be redressed by a favorable decision. Thus, we are in accord with the district court's determination of, but not all its reasoning for, a lack of standing under this theory. *See Warth v. Seldin*, 422 U.S. at 508, 95 S.Ct. 2197.[19]

### 2. Impeachment Power.

Under this theory, appellant maintains that the method of selection of the Reserve Bank representatives of the FOMC renders them "jurisdictionally immune" to the power of impeachment vested in the House of Representatives. This fact, he reasons, diminishes his power to initiate impeachment proceedings as provided by article I, section 2, of the Constitution.

---

16. Brief for the Plaintiff-Appellant at 20, 26–34.

17. *Id.* at 29–30.

18. *Reuss v. Balles*, 73 F.R.D. at 96–97. After reaching this unnecessary conclusion, however, the court did cite an acceptable rationale for its finding of no standing. *Id.* at 97.

19. *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), relied upon to a significant degree by appellant, does not compel an opposite result. In that case, the Court reversed a company's *criminal* conviction for violation of an industry code by holding that the National Industrial Recovery

Act was unconstitutional because it delegated legislative functions, including the establishing of these codes, to completely private groups. A company that could demonstrate *existing or imminent injury in fact* caused by the industry codes formulated by these private groups might have standing to challenge the composition of the groups in a civil suit. *See Buckley v. Valeo*, 424 U.S. 1, 11–12 & n.10, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). It does not follow, however, that a legislator, genuinely concerned about the groups' composition but not adversely affected in any way, could maintain a similar cause of action.

The district court decided against appellant on this theory, primarily because there were "no specific allegations of wrongdoing" by the Reserve Bank representatives that would be grounds for their impeachment. *Reuss v. Balles,* 73 F.R.D. at 96. While we express no opinion on whether such allegations of wrongdoing would form a basis, or the only basis, for impairment of a House member's share of the impeachment power,[20] we do hold that the allegations appellant has advanced in this case are insufficient to confer standing based upon his impeachment theory.

Central to our reasoning for this holding, as it was in our rejection of the preceding theory, is that appellant, "to have standing, must have a *stake* in the controversy at issue, *i. e.,* he himself must perceptibly win or lose depending on the outcome." *Harrington v. Bush,* 553 F.2d at 209. Even if we were to declare, in effect, that the Reserve Bank representatives had to be presidentially appointed, the appellant's interest relative to the impeachment process—primarily the power to initiate impeachment proceedings—would not be changed in the slightest from its present position, since there is nothing to suggest that he cannot now introduce a bill of impeachment.[21] This fact reveals that appellant's complaint for a declaratory judgment is, in actuality, nothing more than "a request for an advisory opinion in clear violation of Article III

limitations." *Id.* We must, of course, deny this request.

Our rejection of appellant's legislator standing theories does not leave him without any means to remedy the allegedly unconstitutional composition of the FOMC. He may, as he has done in the past without ultimate success,[22] introduce a bill requiring all FOMC members to be presidential appointees. *See Public Citizen v. Sampson,* 379 F.Supp. 662, 666–67 (D.D.C.1974), *aff'd mem.,* 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975). This circumstance, while certainly not fatal to his standing claim, does illustrate that his actual controversy lies, or may lie, with his fellow legislators; no supposed impairment of his legislative functions is due, in any part, to the actions or omissions of the named defendants. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

### B. *Standing as a Bondholder.*

■ As a holder of certain marketable bonds, appellant maintains that he has standing to sue because actions taken by the FOMC pursuant to its pervasive regulatory authority might result in his being deprived of property without due process of the law. In particular, he asserts that these actions, because of their effect on interest

---

**20.** At oral argument, Chief Judge Wright questioned whether appellant, or any litigant, had to await actual wrongdoing before bringing an action under this theory, since the threat of impeachment acts as a deterrent to misconduct by civil officers of the United States. Although we agree with the thrust of this contention—that the Reserve Bank members may act less responsibly than they would if declared to be subject to impeachment, *see* THE FEDERALIST, No. 77 (A. Hamilton)—we do not see how it benefits appellant's standing argument, because of the very generalized nature of an injury arising from this fact. While sharing an injury with a large number of persons does not vitiate one's standing, *see Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. 2197; *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), sharing it with every citizen of the United States does, "because of the necessarily abstract nature of the injury all citizens share." *Schlesinger v. Reservists Comm.*

*to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974); *Ex parte Lévitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

**21.** If he were to introduce a bill of impeachment, the question of whether de facto civil officers of the United States are "jurisdictionally immune to the impeachment process" would be sharply presented. We believe that there is particular benefit in this question arising first in the Congress, the branch entrusted by the Constitution with responsibility for exercise of the impeachment power. We venture no opinion on whether the House of Representatives, or the Senate, would reject such a bill on jurisdictional grounds, or on what course a court might take if confronted with such a rejection as a ground for standing.

**22.** J.A. at 46–47.

rates and the rate of inflation, could reduce the value of his bonds in several ways.[23]

In spite of the amended complaint's effort to describe appellant's perceived injury in less speculative terms than those contained in the original complaint, we are of the view that the allegations still are not sufficient to confer standing. Appellant's summation of his most specific allegations provides particular support for this belief: "[A]ny action which the Defendants take *may* cause injury to some property interest of which the Plaintiff is possessed as a bondholder."[24] It appears, therefore, that there is no present or imminent injury to which appellant can point with any degree of specificity, and it is beyond our power to address injuries that are merely conjectural.

Even if appellant could allege a more concrete injury, he would have difficulty establishing that the injury was caused to a sufficient degree by the challenged actions of the appellees. The actions taken pursuant to decisions of the FOMC are but part, albeit an important part, of the forces that determine the value of one's financial holdings. Therefore, even if one considers the FOMC to be the most important component of the Federal Reserve System, it does not necessarily follow that the actions of its members and the Reserve Banks can be singled out in suits seeking to counter perceived declines in the nation's economy.

Further, the problem of redressability is at least as troublesome under this theory as it was under the legislator standing theories. There is no reason to believe that a declaration ultimately resulting in presidential appointment of the entire FOMC would benefit the appellant in any manner whatever, even assuming that a concrete injury caused by the appellees could be established. The same type of decisions would be made by the FOMC, contributing to both increases and decreases in interest rates, the rate of inflation, and other financial indicators.

Finally, even if appellant could overcome these obstacles, he would be faced with the fact that his is a very generalized grievance, one held in common, to some degree, by virtually all members of the public. Recently, for example, the Court of Claims denominated the effect of inflation on judicial salaries as being both indirect and non-discriminatory. *Atkins v. United States*, 556 F.2d 1028, 1051 (Ct.Cl.1977) (per curiam), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). The somewhat unusual features of long-term bonds do not sufficiently distinguish them from the many other forms that an individual's financial holdings can assume, and, since all forms of personal wealth are affected to

---

**23.** Appellant's amended complaint detailed the bondholder standing theory as follows:

> 29. By serving as members of the Federal Open Market Committee, the individual defendants exercise governmental power which can substantially and adversely affect property of the plaintiffs, thereby depriving him of such property without due process of law in the following ways:
>
> (a) By voting to increase prevailing interest rates, the defendant individuals can reduce the market value of the plaintiff's bonds, thereby reducing his net worth and his ability to borrow money.
>
> (b) By voting to decrease prevailing interest rates, the defendant individuals can reduce the returns available to the plaintiff upon the reinvestment of funds derived from the payment of his bonds at maturity, thereby diminishing the plaintiff's future income.
>
> (c) By voting to increase the availability of money and credit, the defendant individuals can reduce the purchasing power of the dollar, thereby diminishing the value in so-called

constant dollars or real terms of the plaintiff's bonds.

> (d) By voting to decrease the availability of money and credit, the defendant individuals can bring about a general reduction in economic activity sufficient to impair the ability of the obligors on the plaintiff's bonds to make payment of interest or principal or both, thereby diminishing or extinguishing their value.
>
> *   *   *   *   *   *
>
> 31. By carrying out the orders of the Federal Open Market Committee in whose issuance there has been unconstitutional participation by the defendant individuals, the defendant banks carry on operations which may deprive the plaintiff of property to the extent or value of more than $10,000 without due process of law.

*Id.* at 12–13.

**24.** Brief for the Plaintiff-Appellant at 34 (emphasis added).

some degree by actions of the type under challenge here, it is difficult to imagine how appellant could set himself apart from other citizens seeking some way to protect the value of their holdings. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 220–21, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Bryan v. Federal Open Market Committee*, 235 F.Supp. 877, 881–82 (D.Mont.1964). We hold, therefore, that appellant lacks standing to sue on his bondholder theory.

### III

Before concluding, we wish to address appellant's argument that the Supreme Court's determination of standing in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), strongly supports his position in this case. We agree that there is a strong similarity between the *Buckley* challenge to the composition of the Federal Election Commission (FEC) and appellant's challenge to the composition of the FOMC, but we also believe there are crucial differences between the two situations.[25]

In its rather brief standing discussion in *Buckley*, the Court took care to stress twice the requirement that parties have to demonstrate a sufficient "personal stake" in the outcome of a controversy before they will be granted access to a federal court's remedial powers. *Id.* at 12 & n.10, 96 S.Ct. 612. Only after they are found to have "sufficient concrete interests at stake" can the parties proceed to raise other challenges, including "constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights." *Id.* at 12 n.10, 96 S.Ct. at 631.

In the case before us, appellant has not satisfied this threshold requirement. Unlike the plaintiffs in *Buckley*, and the cases cited therein,[26] appellant has not demonstrated a personal stake so sufficient that he would benefit from a favorable decision on the merits. In *Buckley*, for example, plaintiffs persuaded the Court that they would benefit directly from a decision nullifying, *inter alia*, those sections of the Federal Election Campaign Act that established reporting and disclosure requirements and that limited campaign expenditures and contributions. *See id.* at 12–84, 96 S.Ct. 612. In turn, they challenged the method of appointment of the members of the FEC, seeking an injunction prohibiting the FEC, until properly constituted, from enforcing these and the other provisions of the Act. This prohibition, at least arguably, was of benefit to those plaintiffs who intended to run for office in the 1976 election and whose rights in that campaign would, to a significant degree, be adjudicated by the FEC. *See id.* at 109–43, 96 S.Ct. 612. An injunction prohibiting the Reserve Bank members from participating in FOMC deliberations and decisions until properly appointed, however, would not be of similar benefit to the appellant. In the first place, the FOMC does not adjudicate his rights in any respect; moreover, as indicated above, neither his legislative powers nor the value

---

**25.** Preliminarily, we note that a statute explicitly providing for judicial review of constitutional challenges was present in *Buckley*. *See Buckley v. Valeo*, 424 U.S. at 8–9 & n.4, 11–12, 96 S.Ct. 612; 2 U.S.C. § 437h(a) (1976). Of course, as the Court explained, such review could only be provided to the extent permitted by article III. 424 U.S. at 11–12, 96 S.Ct. 612; *see Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 & n.22, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

After establishing this analytical basis, the Court proceeded to conclude that "at least some of the appellants have a sufficient 'personal stake' in a determination of the constitutional validity of each of the challenged provisions." *Buckley v. Valeo*, 424 U.S. at 12, 96

S.Ct. at 631 (footnote omitted). *But see id.* at n.11, question & answer 2, 96 S.Ct. 612. Although the Court was not more precise in identifying which plaintiffs had standing on which issues, it did make its standing determination based upon a complaint that details either immediate or imminent injury with a good deal more particularity than the complaint before us in this case. *Compare* Complaint for Declaratory & Injunctive Relief at 3–10, 28–29, 33, *Buckley v. Valeo, with* J.A. at 6, 11–13.

**26.** *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

of his bonds would be enhanced, secured, or otherwise affected by the relief requested. Indeed, the FOMC itself would continue to operate as a seven-member group until the new appointments were made, and there is nothing, short of speculative inference, to indicate that appellant's interests would be affected to any degree by this development. For these reasons, therefore, we believe the case at bar is distinguishable from *Buckley* and its supporting decisions.[27]

## IV

In conclusion, we affirm the district court and hold that appellant lacks standing to sue, both as a legislator and as a bondholder. In neither capacity has he met his responsibility "to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. at 518, 95 S.Ct. at 2215.

*Affirmed.*

J. SKELLY WRIGHT, Chief Judge, dissenting:

In my view *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), clearly establishes that appellant Reuss has standing as a bondholder to challenge the constitutionality of the composition of the Federal Open Market Committee. For this reason—even apart from the difficult questions raised by his claims of legislative standing—I would reverse the judgment of the District Court.

In *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), and *Glidden v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), the Supreme Court addressed challenges to decisions reached or upheld by judges who, it was asserted, were not appointed and did not serve under Article III of the Constitu-

tion. In neither of these cases was there any question of impropriety in the actual conduct of the litigation by the judge in question. Nor was any argument made that the appellant would necessarily receive more favorable treatment or a positive disposition of his case were it relitigated before judges unquestionably appointed pursuant to Article III. No such showing was required; it was sufficient that the appellant alleged that his rights had been adjudicated by an unconstitutionally composed tribunal.

Relying on these decisions, the Supreme Court held in *Buckley v. Valeo* that appellants, a candidate for President, a candidate for reelection to the United States Senate, a potential contributor, and various political associations, had standing to challenge the constitutionality of the method of appointing members of the Federal Election Commission. The Court cited *Palmore* and *Glidden*, as well as its decision in *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), for the proposition that "[p]arty litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights." 424 U.S. at 117, 96 S.Ct. at 681. While the Court noted that in *Glidden* "the challenged adjudication had already taken place, whereas in this case appellants' claim is of impending future rulings and determinations by the Commission," the Court found that "this is a question of ripeness rather than lack of case or controversy under Art. III." *Id.*

In this case, as in *Buckley*, the appellant's claim is that members of an agency whose decisions affect his rights and interests have not been appointed consistent with constitutional requirements of the Appointments Clause, Art. II, § 2. As in *Buckley*, the appellant has a concrete interest in the

---

27. Of course, we do not mean to suggest that the composition of the FOMC is totally immune from challenge; the writ of quo warranto, for example, might be available as a direct attack device. *See Associated Third Class Mail Users v. United States Postal Serv.*, 186 U.S.App.D.C.

331, 340, 569 F.2d 570, 579 & n.24 (1976) (per curiam), *vacated and remanded*, 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977); Fed.R. Civ.P. 81(a)(2). We hold only that, on the facts presented, appellant has not established his standing to make that challenge.

decisions of the agency involved. In this case it is derived from the fact that, as a holder of long-term bonds exceeding $20,000 in value, appellant's property interests will be affected by the actions taken by the FOMC which directly influence prevailing interest rates and, thus, the value of appellant's property.[1] While appellant's property rights are thereby "at stake" in the FOMC's decisions, he cannot establish, as the majority points out,[2] that the allegedly unconstitutional composition of the committee has resulted or will result in devaluation of his property or that he would be materially better off were the members of the Committee constitutionally appointed. But that is not required under Buckley: appellants in Buckley were nowhere required to establish that the method of appointing members to the FEC had any direct, adverse impact upon them, or that different and more favorable decisions would be reached by a properly constituted body. In this case, as in Buckley, Glidden, and Palmore, the fact that an individual's rights are being determined by an allegedly un-

constitutionally composed body is, in itself, sufficient to meet the injury requirement and to permit the court to decide the merits of his constitutional challenge.

The majority today recognizes the "strong similarity between the Buckley challenge to the composition of the Federal Election Commission and appellant's challenge to the composition of the FOMC." Majority opinion, 189 U.S.App.D.C. at ——, 584 F.2d at 470. It attempts to distinguish Buckley, however, on the ground that "[u]nlike the plaintiffs in Buckley and the cases cited therein, appellant has not demonstrated a personal stake so sufficient that he would benefit from a favorable decision on the merits." Id., 189 U.S.App.D.C. at ——, 584 F.2d at 470. Yet as noted earlier, the Buckley plaintiffs in no way demonstrated that the particular composition of the FEC—as distinct from the separate question of the existence of a body charged with enforcement responsibilities for an Act to which they objected[3]—caused them any direct injury

1. Two questions have been raised by the majority with respect to appellant's claim that he has a concrete interest in the decisions reached by the FOMC. The first issue relates to the effect of FOMC actions on the value of appellant's holdings. The majority points out that the "actions taken pursuant to decisions of the FOMC are but part, albeit an important part, of the forces that determine the value of one's financial holdings." Maj. op., 189 U.S.App.D.C. at ——, 584 F.2d at 469. Appellant does not suggest that the FOMC is in any way omnipotent; he recognizes that FOMC decisions respond to various factors in the economy over which it does not have control. The fact remains, however, as the District Court and the majority both recognize, that FOMC decisions do have a definite effect on prevailing interest rates, and thus on the value of appellant's holdings. See Maj. op., 189 U.S.App.D.C. at ——, 584 F.2d at 469; J.A. 161. And should there remain any question as to this point, appellant should at least have been afforded the opportunity to prove the truth of what he asserted.

A second and related issue is raised by the majority's statement that appellant's grievance is "one held in common, to some degree, by virtually all members of the public." Maj. op., 189 U.S.App.D.C. at ——, 584 F.2d at 469. In the District Court appellant offered to introduce evidence to establish that there is a qualitative difference between the impact of FOMC decisions on a holder of currency and on a

holder of long-term bonds. The District Court, however, without allowing appellant to introduce this evidence, simply stated that the appellant's contentions are "generalized concerns or grievances shared by many members of the public," a view adopted by the majority as well. Thus the majority concludes that "[s]ince all forms of personal wealth are affected to some degree by actions of the type under challenge here, it is difficult to imagine how appellant could set himself apart from other citizens seeking some way to protect the value of their holdings." Maj. op., 189 U.S.App.D.C. at ——, 584 F.2d at 469 (emphasis added). Yet that is precisely what appellant offered to do in the District Court. Here again, appellant should at least be afforded an opportunity to introduce evidence as to a factual point which the majority views as critical before this court rules against him because of the absence of such proof.

2. Maj. op., 189 U.S.App.D.C. at ——, 584 F.2d at 470.

3. Judge Tamm seems to suggest that the Buckley appellants' concrete interest in those sections of the Federal Election Campaign Act establishing reporting and disclosure requirements and limiting campaign expenditures and contributions "[i]n turn" provided appellants with a basis for challenging the method of appointing members to the FEC. Maj. op., 189

or that they would receive different or more favorable treatment from a properly appointed body. Indeed, when the majority is forced to explicate its purported distinction, it can do no more than point out that a court order prohibiting the FEC, until properly constituted, from enforcing the Act, "*at least arguably,* was of benefit to those plaintiffs who intended to run for office in the 1976 election and whose rights in that campaign would, to a significant degree, be adjudicated by the FEC." *Id.,* 189 U.S. App.D.C. at ——, 584 F.2d at 470 (emphasis added).

With all due respect, I find this distinction wholly unpersuasive. To begin with, the Supreme Court, in holding that the *Buckley* appellants had standing, nowhere mentioned, let alone relied upon, any benefit they would secure from an injunction against FEC operations until the Commission was properly constituted. Quite to the contrary, the Court granted a stay of its order insofar as it affected the powers of the Commission so as to "afford Congress an opportunity to reconstitute the Commission by law or to adopt other valid enforcement mechanisms *without interrupting enforcement of the provisions the Court sustains,* allowing the present Commission in the interim to function *de facto* in accordance with the substantive provisions of the Act." 424 U.S. at 143, 96 S.Ct. at 693 (emphasis added). Moreover, even were there some benefit to be secured from a short-term delay in enforcing the provisions of the Act upheld by the Court, it is not at all clear why the particular appellants in *Buckley* who intended to run for office, as opposed, say, to their opponents, would de-

rive such a benefit; certainly, what is involved is pure speculation in either event. The critical point of *Buckley* is that such a benefit was neither established nor required in order for the court to reach the merits of the appellants' claim.

In my view, there simply is no valid distinction to be drawn between the case before us and *Buckley v. Valeo,* and our decision today should therefore be controlled by *Buckley.* On this basis, I respectfully dissent from the decision of the majority.

U.S.App.D.C. at ——, 584 F.2d at 470. There is no question, however, that the fact that an individual has standing to raise one claim—here, to the substantive provisions of the Act—does not afford him standing to raise other, separate claims—here, to the method of appointing Commission members. In *Buckley* the appellants' objections to the substantive provisions of the Act cited by Judge Tamm were in no way related to their challenge to the method of appointing FEC members; there was, I must emphasize again, no showing in *Buckley* that the unconstitutional composition of the Commission, in and of itself, caused the appellants

any direct harm or that a properly constituted body would reach different decisions more favorable to their interests. To be sure, because they objected to the reporting requirements and expenditure and contribution provisions of the Act, the *Buckley* appellants might benefit from any relief which would undermine the statute's enforcement. But such benefits are relevant only to their challenges to these substantive provisions of the Act; they do not provide a basis for standing to raise the unrelated claim that the members of the Commission should be appointed by the President rather than by Congress.