Floyd SPENCE, Member of the U.S. House of Representatives, et al., Plaintiffs,

v.

William J. CLINTON, President of the United States,

and

William J. Perry, Secretary of Defense, Defendants.

Civil Action No. 96–01671.

United States District Court, District of Columbia.

Oct. 9, 1996.

34

George Miron, Douglas Jay Feith, Feith & Zell, P.C., Washington, DC, for plaintiffs.

Andrea M. Sharrin, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## *MEMORANDUM OPINION*

SPORKIN, District Judge.

This matter is before the Court on Defendants' motion to dismiss and Plaintiff's opposition thereto. The Court heard oral argument from the parties on October 3, 1996.

Plaintiffs are forty-one members of the U.S. House of Representatives seeking injunctive and declaratory relief. Plaintiffs claim that the President, acting through the Secretary of Defense, has violated his Constitutional duties by failing to comply with the statutory mandates of Title II of the National Defense Authorization Act for Fiscal Year

1996, Subtitle C, §§ 231–238, 110 Stat. 228 (February 10, 1996) (the "Ballistic Missile Defense Act") and by refusing to spend or obligate funds appropriated by the Department of Defense Appropriations Act of 1996 (the "Defense Appropriations Act").

Defendants move to dismiss on jurisdictional grounds, claiming that Plaintiffs lack standing and that the lawsuit should be dismissed under the political question doctrine. Defendants also argue that there is no right of action under the Ballistic Missile Defense Act and that Plaintiffs have not established their entitlement to the relief of mandamus.

After considering the motion, all opposition thereto, and the arguments by the parties, the Court grants Defendants' motion to dismiss, without prejudice.

## BACKGROUND

A ballistic missile is any missile that does not rely upon aerodynamic surfaces to produce lift and consequently follows a ballistic trajectory when thrust is terminated. Ballistic missiles are capable of carrying conventional explosives, nuclear warheads, chemical or biological warfare agents and radiological agents. A ballistic missile defense system is one designed to intercept ballistic missiles or their payloads and destroy them before they reach their targets.

For decades the United States have been working to develop ballistic missile defenses of various kinds. These efforts have been fraught with political, technical and legal disputes. Thus far, the United States has placed in service only versions of the Patriot, an air defense system, with improvements designed to protect only the point immediately around its own site against ballistic missiles. Theater missile defense systems, sys-

tems with greater range than the Patriot and the capability to defend areas rather than just points, are still in research and development.

In the Ballistic Missile Defense Act, Congress announced the policy of the United States "to deploy affordable and operationally effective theater missile defenses to protect forward-deployed and expeditionary elements of the Armed Forces of the United States and to complement the missile defense capabilities of forces of coalition partners and of allies of the United States." Id., § 233(1). To implement this policy, Congress directed the Secretary of Defense to "restructure the core theater missile defense program" to achieve certain capabilities for four theater defense systems. Id., § 234(a). Among the four systems and at issue here are the U.S. Army's Theater High–Altitude Area Defense ("THAAD") and the U.S. Navy's Theater-wide Defense ("NTW"). Both the THAAD and NTW systems are "upper tier" defense systems which are designed to defeat long-range ballistic missiles and to defend areas beyond the capabilities of lower-tier systems.[1]

Under the Ballistic Missile Defense Act, the THAAD system is to have a user operational evaluation system ("UOES") by fiscal year 1998 and a first unit equipped ("FUE") by fiscal year 2000. The NTW system is to have a UOES by fiscal year 1999 and an initial operational capability ("IOC") during fiscal year 2001. Id., § 234(a)(3), (4).[2] To accomplish these objectives, the Ballistic Missile Defense Act directs the Secretary of Defense to detail annually "the technical milestones, the schedule, and the cost of each phase of development and acquisition for each theater missile defense program" as

---

1. The two lower-tier systems not at issue in this case include the Patriot PAC–3 system and the Navy Lower Tier (Area) system. Id., § 234(a)(1), (2). These defense systems would defeat short-to-medium range theater ballistic missiles.

2. Specifically § 234 provides, in relevant part,

"(a) Establishment of Core Program.—To implement the policy established in paragraph (1) of section 233, the Secretary of Defense shall restructure the core theater missile defense program to consist of the following systems, to be

carried out so as to achieve the specified capabilities: ...

(3) The Theater High–Altitude Area Defense (THAAD) system, with a user operational evaluation system (UOES) capability, not later than fiscal year 1998 and a first unit equipped (FUE) not later than fiscal year 2000.

(4) The Navy Upper Tier (Theater Wide) system, with a user operational evaluation system (UOES) capability during fiscal year 1999 and an initial operational capability (IOC) during fiscal year 2001."

well as "any variance in the technical milestones, program schedule milestones, and costs for the program compared with the information relating to that program in the report submitted in the previous year and in the report submitted in the first year in which that program was covered." *Id.*, § 234(e)(1), (2).

Congress subsequently appropriated a total of $9,411,057,000 for research, development, test and evaluation in the Defense Appropriations Act. These are the funds out of which the THAAD and NTW systems are to be financed and will remain available for obligation until September 30, 1997. The Defense Appropriations Act does not specify the amounts that must be spent on each such program to meet the deadlines mandated in § 234(a) of the Ballistic Missile Defense Act, although it does specify that "not less than $200,442,000" must be spent on the NTW system.

On February 16, 1996, the Secretary of Defense released the results of a comprehensive review of the ballistic missile defense program led by Dr. Paul G. Kaminski, the Under Secretary of Defense for Acquisition and Technology (the "Kaminski Review"). As a result of the Kaminski Review, the Secretary announced that the Department of Defense intended to restructure the development of the THAAD and NTW systems. The restructuring would result in a delay for certain programmatic milestones for the THAAD and NTW programs, beyond those envisioned in the Ballistic Missile Defense Act. *See* News briefing by Secretary William Perry and Under Secretary Paul Kaminski, Department of Defense (February 16, 1996), *available* in Westlaw, 1996 WL 67375.

Congress held hearings on the Kaminski Review beginning on March 6, 1996. At the hearing on March 6, 1996, Under Secretary Kaminski acknowledged that the Department of Defense intended to "roll back" the schedule for THAAD and NTW. He noted that the Department of Defense would honor the UOES for the THAAD system, but did not intend to meet the FUE milestone for THAAD or the IOC milestone for Navy Upper Tier. *See* Draft copy of *The 1996 Ballistic Missile Defense Update Review: Hearings before the Senate Committee on Armed Services,* 104th Cong., 2nd Sess. 80 (1996) (statement of Paul Kaminski, Under Secretary of Defense for Acquisition and Technology). On March 7, 1996, Lieutenant General Malcolm R. O'Neill, Director of the Department of Defense Office of Ballistic Missile Defense, testified that the Department of Defense had moved the FUE date for the THAAD system to the year 2006. *Id.* at 68. The Department of Defense also informed Congress that it had not restructured the NTW program to meet any particular UOES or IOC date. Amended Cmplt. ¶ 64.

Plaintiffs claim that Defendants' announced refusal to restructure the THAAD and NTW systems in accordance with the statutorily mandated milestones violates § 234(a) of the Ballistic Missile Defense Act and that Defendants' refusal to spend or obligate funds for the systems violates the Defense Appropriations Act. Plaintiffs claim further that such refusals violate the President's Constitutional duty to "take Care that the Laws of the United States be faithfully executed." Art. II, § 3. Said violations have precluded Congress from exercising various powers vested in it by the Constitution.[3] Plaintiffs pray for injunctive and declaratory relief. Defendants move to dismiss on jurisdictional grounds, as described above.

## ANALYSIS

 This case presents basic constitutional issues involving the separation of powers, including the various jurisdictional issues addressed in the parties' memoranda. As a general proposition, courts adopt a doctrine of judicial abstention in such matters. After

---

**3.** Plaintiffs' claimed violations of powers include the power to legislate (Art I, § 1); to override a Presidential veto (Art I, § 7, cl. 2); to provide for the common defense (Art I, § 8, cl. 1); to declare war (Art I, § 8, cl. 11); to raise and support Armies (Art. I, § 8, cl. 12); to provide and maintain a Navy (Art I, § 8, cl. 13); to make rules for the Government and Regulation of the land and naval forces (Art I, § 8, cl. 14); and to make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers and all other Powers vested by the Constitution in the Government of the United States, or in any Department or Officer thereof, (Art. I, § 8, cl. 18).

considering the motions, all opposition thereto and the oral arguments of the parties, this Court has concluded that the dispute in this case between the executive and legislative branches related to the ballistic missile defense program is not yet ripe for judicial resolution. It is also questionable whether the congressional Plaintiffs have yet established standing.

Nonetheless, the Court does not accept the Defendants' argument that this matter is inherently non-justiciable. On standing, it is foreseeable that the congressional Plaintiffs might yet be able to climb the requisite high wall of congressional standing with respect to this matter. On the political question issue, while the Court seeks generally to honor the doctrine of judicial abstention, it will not condone the executive branch violating the law if such violation becomes clear and not resolvable otherwise.

 **1. Standing.** The Members of Congress who bring this action, like any plaintiffs, must demonstrate that they have standing under Article III to invoke the jurisdiction of this Court. *See Boehner v. Anderson,* 30 F.3d 156, 159 (D.C.Cir.1994) (citing *Reuss v. Balles,* 584 F.2d 461, 466 (D.C.Cir.), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978)) ("a legislator receives no special consideration in the standing inquiry"). To do so, Plaintiffs must demonstrate that they have suffered "(1) . . . an injury in fact; (2) to an interest arguably within the zone of interests protected in the constitutional guarantee at issue . . . (3) resulting from the putatively illegal conduct and; (4) which could be redressed by a favorable decision of the court." *Michel v. Anderson,* 817 F.Supp. 126, 136 (D.D.C.1993), *aff'd,* 14 F.3d 623 (D.C.Cir.1994) (citing *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

 Suits by congressional plaintiffs against the Executive Branch "pose separation-of-powers concerns which may affect a complainant's standing to invoke the jurisdiction of the federal courts." *Moore v. United States House of Representatives,* 733 F.2d 946, 951 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985).

Congressional plaintiffs must ensure that their alleged injury is " 'specific and cognizable,' arising out of an interest 'positively identified by the Constitution.' " *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1381 (D.C.Cir.1984) (quoting *Moore,* 733 F.2d at 951); see also *Michel,* 817 F.Supp. at 136 ("Absent a compelling and specific injury, the Court must decline to involve itself in an action against a coordinate branch of government.").

 Against this background, courts will not grant standing to congressional plaintiffs "alleging generalized, amorphous injuries due to either the actions of their colleagues in Congress or the conduct of the Executive." *Moore,* 733 F.2d at 951. Courts will grant standing to congressional plaintiffs when "the alleged diminution in congressional influence . . . amounts to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity." *Goldwater v. Carter,* 617 F.2d 697, 702 (D.C.Cir.), *vacated and remanded on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *Moore,* 733 F.2d at 952. *See also Harrington v. Bush,* 553 F.2d 190 (D.C.Cir.1977); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974).

Each of the parties argues that the case law on congressional standing creates a different "bright line" test for nullification of a congressional vote and, consequently, the creation of congressional standing. Defendants point to *Harrington* and claim that the congressional disenfranchisement required to create standing cannot be created from a post-enactment interest. In *Harrington,* a legislator sought declaratory and injunctive relief to prevent the Central Intelligence Agency from using funds for allegedly illegal activities. The court rejected plaintiff's various asserted constitutional injuries of impairment to past and prospective votes on appropriations and the general lawmaking powers of Congress. The court then concluded that, while there is always a potential for misuse of appropriated funds, a legislator must establish a connection between such activities and specific congressional interests to have standing. Id. at 212. Defendants point to the court's statement that a legislator's

"rights, interests and prerogatives lie in the power to make laws" and that "once a bill becomes a law, such injury which is inflicted by its operations would seem to fall equally on all citizens." *Id.* at 213. Defendants would have this Court conclude with the *Harrington* court that where the impact of illegality is shared by all citizens, any injury "becomes a 'generalized grievance about the conduct of government' which lacks the specificity to support a claim of standing." *Id.* at 214.

But this matter is distinguishable from *Harrington.* The *Harrington* court found that the appellant-congressman's "real interest is in having the question of the legality of certain of the CIA's activities decided one way or the other. . . . [he] claims no particular interest in the outcome and it appears that either result would serve his asserted need for information . . . appellant is a bystander as to the result of the controversy." *Id.* at 209. Moreover, the appellant-congressman in *Harrington* claimed "subjective injury to his overall effectiveness" as a legislator rather than "objective injury the [his] vote on a particular bill." *Id.* at 212. In this matter, however, Plaintiffs point to an alleged and objective nullification of two specific congressional votes related to the THAAD and NTW programs.

■ Moreover, this Court cannot accept the proposition that a Member of Congress has no greater interest in a specific law once enacted than does any other citizen of the republic and that no post-enactment actions or omissions of the executive branch would be actionable in the courts. Such an outcome would overturn congressional votes by effectively giving the President the ability to nullify duly authorized congressional actions. The Founding Fathers strongly believed that such a power would be dangerous and unwarranted.[4] Constitutional scholars speak

with one voice in concurring with this assessment.[5]

■ But this Court cannot yet conclude that Plaintiffs' vote has been nullified. The funds appropriated for the THAAD and NTW programs remain available for obligation until September 30, 1997 and the ongoing dialogue between the Department of Defense and the Congress suggests that the two branches of government may yet have a meeting of the minds. It is not yet clear that the congressional votes at issue have been nullified.

Also, Plaintiffs have not argued convincingly that standing has been created *at this time* based on the *Kennedy* case. In *Kennedy,* Senator Edward Kennedy of Massachusetts sued the Administrator of the General Services Administration and the Chief of White House Records to declare invalid Richard Nixon's purported exercise of a pocket-veto of the Family Practice of Medicine Act. President Nixon had allowed more than ten days to expire without signing the bill or returning it unsigned. President Nixon claimed he had effectively pocket-vetoed the Bill because the Senate's recess constituted an adjournment for purposes of the Constitution.

The court did hold in *Kennedy* that Senator Kennedy had established standing because President Nixon's action nullified a congressional vote. However, the level and specificity of congressional vote nullification in this matter is much less direct since it does come post-enactment. *Kennedy* does not go far enough to establish Plaintiff's claim at this time.

In sum, congressional standing may yet be established in this matter but Plaintiffs have not done so at this time.

---

4. As James Madison put it: "To give such a prerogative would certainly be obnoxious to the temper of this country." I.M. Farrand, *The Records of the Federal Convention of 1787,* 100 (1966).

5. *See,* for example, Arthur S. Miler, *The President and Faithful Execution of the Law,* 40 V. AND L.Rev. 389, 397–98 (1987); Harold J. Krent, *Separating the Strands in Separation of Power Con-*

*troversies,* 74 U.Va.L.Rev. 1253, 1269 (1988); Frank Church, *Impoundment of Appropriated Funds: The Decline of Congressional Control Over Executive Discretion,* 22 Stan.L.Rev. 1240, 1249–50 (1970); and Abner J. Mikva and Michael F. Hertz, *Impoundment of Funds—The Courts, The Congress and the President: A Constitutional Triangle,* 69 NW U.L.Rev. 335, 381 (1974).

■ **2. Political Question Doctrine.** The political question doctrine, an aspect of Article III jurisdiction, arises from two key constitutional principles of our system of government: the separation of powers among the three coordinate branches and the inherent limits of judicial abilities. *See, e.g. Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948); *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1378–79 (D.C.Cir. 1981), *cert. denied*, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982). The doctrine recognizes that a "court [must] not insert itself in a political matter which is principally in the dominion of a political branch of government." *McIntyre v. O'Neill*, 603 F.Supp. 1053, 1059 (D.D.C.), *vacated on other grounds*, 766 F.2d 535 (D.C.Cir.1985).

■ In *Baker*, the Supreme Court articulated six factors which guide the determination of whether a non-justiciable political question exists:

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a Court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217, 82 S.Ct. at 710. The presence of any one of these factors is sufficient to render an issue nonjusticiable. *Cranston v. Reagan*, 611 F.Supp. 247, 252 (D.D.C. 1985); *Barkley v. O'Neill*, 624 F.Supp. 664, 667 (S.D.Ind.1985).

■ The issue here is whether the Court can resolve this fundamental question between the executive and legislative branches without "expressing a lack of respect due coordinate branches of government." *Baker*, 369 U.S. at 217, 82 S.Ct. at 710. Defendants argue that judicial review of this matter would insert the Court into a political tug-of-war between the political branches of government regarding the particulars of highly controversial strategies for two national defense systems and related budgetary disputes.

■ As a general proposition, it is preferable for a court to abstain for as long as possible from involving itself in such matters. "The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise we would encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict." *Goldwater v. Carter*, 617 F.2d 697 (D.C.Cir.), *vacated and remanded on other grounds*, 444 U.S. 996, 996, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). In sum, due respect for the coordinate branches of government requires courts to refrain from resolving political disputes unless and until effective functioning of the government makes it vital to do so.

■ This dispute between the executive and legislative branches with respect to the ballistic missile defense program is not yet ripe for resolution by the judicial branch. Basic budgetary, technical and strategic implications of the ballistic missile defense program continue to be studied within and outside the Department of Defense and it appears that the parties continue to maintain a dialogue on how best to implement Congress' intent with respect to the program, as incorporated into the National Defense Authorization Act for Fiscal Year 1996.

The dialogue is evidenced by the March 1996 hearings held by the Senate Committee on Armed Services after the Department of Defense released the Kaminski Report. During the hearings, officials testifying on behalf of the Department of Defense and legislators engaged in a thorough and active

discussion of the very issues raised in Plaintiffs' complaint. Congress may yet act on these findings to reaffirm its commitment to the milestones in the Ballistic Missile Defense Act, to alter its timetables, or to address the budgetary, technical and strategic concerns outlined by the Department of Defense. The Department of Defense may also reassess the Kaminski Report. The Court believes prudence requires that the executive and legislative branches be given further opportunities to resolve their differences before the third branch of government is brought into the dispute.

Nonetheless, there may yet come a day when Congress will speak more clearly on this matter and dialogue with the executive branch will have been exhausted. If and when that day comes, this Court will revisit the critical issues presented here. The Court does not believe that the executive can blatantly defy the Congress where the national security interest may be at stake. Under such circumstances, this Court will not condone the executive branch defying the explicit laws enacted by the Congress.[6]

Accordingly, this Court will abstain from injecting itself into this dispute at this time and Defendant's motion to dismiss will be granted without prejudice.

---

6. The Court believes that, before it allows itself to become enmeshed in a dispute between two co-ordinate branches of government, the matter in controversy must be of extreme importance to the well-being of the nation. Important issues of national defense certainly would meet such a standard. However, courts must exercise restraint in order to avoid involving themselves in every two-bit scrape between the executive and legislative branches.